# EXHIBIT A

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF HUMBOLDT

ALLEN FARON,                         )
                                     )
        Plaintiff,                   )
                                     )
    vs.                              ) No. DR070032
                                     )
ST. JOSEPH HOSPITAL; ST. JOSEPH      )
HEALTH SYSTEM; KEVIN MOLANDER,       )
M.D.; JOHN KELSEY, M.D.; RONALD      )
CORDONVA, M.D.; and DOES 1 through   )
50, inclusive,                       )
                                     )
        Defendants.                  )
_____ )


DEPOSITION OF SUSAN WHITTAKER
Santa Ana, California
Wednesday, June 20, 2007


Reported by:
PAULINA BALBUENA
CSR No. 12898
JOB No. 75072

---

1   APPEARANCES:
2
3   For Plaintiff:
4       LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
        BY:  KENT L. KLAUDT
5       Attorney at Law
        Embarcadero Center West
6       275 Battery Street, 30th Floor
        San Francisco, California 94111
7       (415) 956-1000
8
    For Defendant St. Joseph Health System:
9
        PAUL, HASTINGS, JANOFSKY & WALKER LLP
10      BY:  JOHN PHILLIPS
        Attorney at Law
11      55 Second Street, 24th Floor
        San Francisco, California 94105
12      (415) 856-7027
13
    For Defendants Kevin Molander, M.D.; John Kelsey, M.D.;
14  Ronald Cordova, M.D.:
15      GALLOWAY, LUCCHESE, EVERSON & PICCHI
        BY:  JOSEPH E. FINKEL
16      Attorney at Law
        1676 North California Boulevard, Suite 500
17      Walnut Creek, California 94596
        (925) 930-9090
18
19  For Defendant St. Joseph Hospital of Eureka:
20      MITCHELL, BRISSO, DELANEY & VRIEZE
        BY:  NANCY K. DELANEY
21      Attorney at Law
        814 Seventh Street
22      Eureka, California 95501
        (707) 433-5643
23
24
25
                                        Page 3

---

1       SUPERIOR COURT OF THE STATE OF CALIFORNIA
2                   COUNTY OF HUMBOLDT
3
4   ALLEN FARON,                         )
                                         )
5           Plaintiff,                   )
                                         )
6       vs.                              ) No. DR070032
                                         )
7   ST. JOSEPH HOSPITAL; ST. JOSEPH      )
    HEALTH SYSTEM; KEVIN MOLANDER,       )
8   M.D.; JOHN KELSEY, M.D.; RONALD      )
    CORDONVA, M.D.; and DOES 1 through   )
9   50, inclusive,                       )
                                         )
10          Defendants.                  )
    _____ )
11                                       )
    AND RELATED CROSS-ACTIONS.           )
12  _____ )
13
14
15
16      Deposition of SUSAN WHITTAKER, taken on
17  behalf of Plaintiff, at 2850 Red Hill
18  Avenue, Suite 120, Santa Ana, California,
19  beginning at 10:37 a.m. and ending at
20  2:16 p.m. on Wednesday, June 20, 2007,
21  before PAULINA BALBUENA, Certified Shorthand
22  Reporter No. 12898, RPR.
23
24
25
                    Page 2

---

1   APPEARANCES (Continued):
2
3   Also Present:
4       DAN GLASSMAN
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 4

---

1 (Pages 1 to 4)

INDEX

WITNESS          EXAMINATION
SUSAN WHITTAKER

      BY MR. KLAUDT          8

      EXHIBITS
DEPOSITION          PAGE

1    Plaintiff's First Re-Notice of Taking          15
     Deposition of "Persons Most Qualified" of
     Defendant St. Joseph Health System; 7
     pages
2    Printouts from St. Joseph Health System          31
     Web site; 10 pages
3    St. Joseph Hospital, Redwood Memorial          42
     Hospital brochure; 1 page
4    Various articles from Times-Standard; 10          64
     pages
5    Organizational chart; 1 page          84
6    American Unity Group, Ltd., Declarations          86
     and Endorsement; 2 pages
7    Document titled Creating Healthy          90
     Communities; 1 page
8    Printout from St. Joseph Health System          97
     Web site, SJHS Leadership Team; 5 pages
9    Humboldt County Task Force White Paper;          101
     28 pages
10   St. Joseph Hospital Application for          110
     Appointment to the Medical Staff; 6 pages

Page 5

INDEX (Continued):

     INSTRUCTION NOT TO ANSWER

          Page     Line

          76        3

Page 6

---

Santa Ana, California, Wednesday, June 20, 2007
          10:37 a.m. - 2:16 p.m.

          SUSAN WHITTAKER,
having been first duly sworn, was examined and testified
as follows:

          EXAMINATION
BY MR. KLAUDT:
     Q    Would you please state and spell your last
name for the record.
     A    Susan Whittaker, S-u-s-a-n  W-h-i-t-t-a-k-e-r.
     Q    Good morning, Ms. Whittaker.  My name is Kent
Klaudt.  I represent Allen Faron in a lawsuit against
St. Joseph Health System and St. Joseph Hospital of
Eureka; and I'll be taking your deposition today.
     Do you understand that you've taken an oath to
tell the truth and you're testifying under penalty of
perjury today?
     A    Yes.
     Q    Okay.  Have you had the opportunity to discuss
with your counsel the procedures and protocols for a
deposition?
     A    Yes.
     Q    Okay.  I'll be very brief, then.

Page 7

---

     I understand you're an attorney, correct?
     A    Yes.
     Q    You've had your deposition taken on more than
one occasion, correct?
     A    Yes.
     Q    On approximately how many occasions have you
had your deposition taken?
     A    Twice.
     Q    To make the court reporter's job easier, if
you could please wait until I finish my question
completely before you begin your answer, that makes it
easier for the court reporter to transcribe everything
so that the record is clear.  Okay?
     A    Yes.
     Q    Are you taking any medication that would
prevent you from giving accurate or honest testimony
this morning?
     A    No.
     Q    And is there any other reason you would not be
able to give accurate or honest testimony this morning?
     A    No.
     Q    Okay.  At the conclusion of your deposition,
the court reporter will prepare a transcript containing
your testimony and you will have the opportunity to
review that transcript and to make changes to your

Page 8

---

2 (Pages 5 to 8)

1  deposition testimony if you so desire.
2      However, if you do make substantive changes to
3  your testimony, any of the parties will have a right to
4  comment upon those changes and perhaps use those changes
5  to attack your credibility at trial.  Does that make
6  sense?
7      A   Yes.
8      Q   The two depositions which you've given
9  testimony in the past, what types of cases were those?
10     A   One was a medical malpractice case and one was
11 a legal malpractice case.
12     Q   And in both of those depositions were you
13 testifying in your capacity as an employee of St. Joseph
14 Health System?
15     A   In just the one medical malpractice case.
16     Q   And what year was that?
17     A   I believe it was over five years ago.
18     Q   Okay.  Was that in a state court or federal
19 court?
20     A   That was in a state court.
21     Q   In California?
22     A   Yes.
23     Q   Do you recall which county that case was
24 pending in?
25     A   Orange County.

Page 9

1      Q   What was the name of that case?
2      MR. PHILLIPS:  It's not a memory contest.
3      THE WITNESS:  I don't recall.
4  BY MR. KLAUDT:
5      Q   You don't recall?
6      A   I don't.
7      Q   That reminds me of one further instruction,
8  which is, we don't want you to guess or speculate, but
9  if you are capable of forming an estimate, especially as
10 it concerns times and distances, then I am entitled to
11 your best estimate.  Does that make sense?
12     A   Yes.
13     Q   And were you testifying at deposition in that
14 case in the capacity as a person most knowledgeable or
15 person most qualified?
16     A   Yes, I was.
17     Q   And you were not an individual defendant in
18 that case, correct?
19     A   No, I was not.
20     Q   Okay.  And the legal malpractice case, what
21 capacity did you testify in that case?
22     A   As an attorney who worked on a matter that our
23 client ended up suing the first law firm for legal
24 malpractice.
25     Q   Okay.  And who was your employer at the time

Page 10

1  you gave that deposition testimony?
2      A   At the time I was working with St. Joseph
3  Health System.  The matter arose when I was working with
4  Carpenter, Higgins and Simons.
5      Q   And is it fair to say that matter has nothing
6  to do with St. Joseph Health System?
7      A   Yes.
8      Q   Did you bring with you a copy of your CV?
9      A   No, I did not.
10     Q   Okay.  Let me just ask you if you could tell
11 me your educational background since college.
12     A   Since college?
13     Q   Well, beginning with college.  Sorry.
14     A   Okay.  I'm a registered nurse.  And from
15 nursing school went to Cal State University, got a
16 degree in Health Care Administration and Public Policy,
17 and then went to Loyola Law School.
18     Q   And who's your current employer?
19     A   St. Joseph Health System.
20     Q   And how long have you been employed by
21 St. Joseph Health System?
22     A   20 1/2 years.
23     Q   Continuous full-time employment?
24     A   Yes.
25     Q   And what's your business address?

Page 11

1      A   500 South Main Street, Suite 1000, Orange,
2  California 92868.
3      Q   And what's your job title at St. Joseph Health
4  System?
5      A   Chief administrative officer and governance
6  counsel.
7      Q   Have you had any other job titles or job
8  descriptions during your 20-plus-year employment with
9  St. Joseph Health System?
10     A   Yes.
11     Q   Can you tell me what those are.
12     A   When I started my career at St. Joseph, I was
13 corporate counsel.  Then I became vice president of
14 legal services, then general counsel, and then my
15 current title.
16     Q   And in your current title as chief
17 administrative officer and governance counsel, what are
18 your duties and responsibilities?
19     A   I'm responsible for coordinating corporate
20 services, supporting system office services to our local
21 ministries, and providing counsel relative to governance
22 matters.
23     Q   What do you mean by "governance matters" in
24 the context of your employment at St. Joseph Health
25 System?

Page 12

3 (Pages 9 to 12)

1    A    Advice related to compliance with corporate
2    formalities, advice related to requirements pursuant to
3    our bylaws, advice related to compliance with California
4    corporations code, IRS regulation for tax-exempt
5    organizations.
6    Q    Anything else?
7    A    Anything they'd like me to do.
8    Q    Okay. Do you try cases for St. Joseph Health
9    System?
10    A    No, I do not.
11    Q    When you were an R.N., did you have any
12    specialties?
13    A    Yes, I was a perinatal nurse.
14    Q    Do you still have a current R.N. license?
15    A    Yes, I do.
16    Q    When was the last time you worked as an R.N.?
17    A    Well, unless you count volunteering, it would
18    be 22 years ago.
19    Q    Okay. And have you had more recent experience
20    as an R.N. in a volunteer capacity?
21    A    Not recent, no.
22    Q    Other than the two prior depositions that you
23    told me about, have you ever testified at any
24    arbitration or trial?
25    A    No.

Page 13

1    Q    Okay. So you've never been qualified as an
2    expert witness, as an expert R.N., or an expert attorney
3    or an expert in any other matter or any other court?
4    A    No, I have not.
5    Q    And do you understand that you have been
6    produced as a witness for the Health System today in
7    response to Plaintiff's Notice of Taking Deposition of
8    Persons Most Qualified of Defendant St. Joseph Health
9    System?
10    A    Yes.
11    Q    Okay. Can we mark this as Exhibit 1.
12    (Deposition Exhibit 1 was marked for
13    identification by the court reporter.)
14    BY MR. KLAUDT:
15    Q    And handing you what's been marked as
16    Exhibit 1, take a second to look at that and I'll have
17    some questions about the notice.
18    Have you ever seen Exhibit 1 before?
19    A    Yes.
20    Q    Okay. And I understand you're being
21    represented by counsel at today's deposition; is that
22    correct?
23    A    Yes.
24    Q    And that's Mr. Phillips?
25    A    Yes.

Page 14

1    Q    There were numerous document requests made in
2    connection with this notice of deposition, and I have
3    received a response from your counsel. And my question
4    for you or for Mr. Phillips is with respect to the
5    organizational charts.
6    I believe your response indicated that you
7    would be producing those and I have not received those.
8    I'm wondering if those can be produced this morning at
9    this deposition if possible.
10    MR. PHILLIPS: I don't know. I don't think
11    so. My assumption was if we had any that were
12    responsive, they went over to you in response to the
13    document request. So we can take a break and talk about
14    it, but I don't have any documents.
15    MR. KLAUDT: Okay.
16    MR. PHILLIPS: Because the document request
17    attached to the notice are identical to the RFPs that
18    were served earlier in the case.
19    Which request is it, Kent?
20    MR. KLAUDT: It's Request No. 11. And you
21    indicated that defendant would be producing
22    nonprivileged documents in its possession that are
23    responsive to the request, so I'm wondering if there's
24    anything out there that was organizational charts.
25    MR. PHILLIPS: Well, organizational charts is

Page 15

1    broader than the question, so let me follow up on the
2    break. Because if that's the org charts depicting a
3    relationship between -- and that might be why they just
4    don't exist.
5    MR. KLAUDT: Sure. Thank you.
6    And the other one I wanted to ask you about is
7    No. 15, which asked you to produce any Web pages
8    published on your Web site related to Defendant
9    St. Joseph Hospital that existed between the relevant
10    time period.
11    And I didn't receive any documents responsive
12    to that request, so could you check with whoever you
13    need to check with on the break and see if anything
14    could be produced?
15    MR. PHILLIPS: Okay. My assumption is that
16    since these are available, probably on the Web site,
17    that you could get those as well. I suspect that was
18    the objection asserted in the RFP as well. I'll follow
19    up on the break.
20    MR. KLAUDT: Thank you. I appreciate it.
21    Q    And, Ms. Whittaker, did you bring any
22    documents with you today responsive to these documents
23    requests?
24    A    No.
25    MR. KLAUDT: Also, Counsel, I note there were

Page 16

4 (Pages 13 to 16)

1  numerous objections to these requests and it appears
2  that you've refused to produce documents in response to
3  some of these requests. Would you like to meet and
4  confer on the record?
5      MR. PHILLIPS: No. I think that's a waste of
6  time.
7      MR. KLAUDT: Would you agree to meet and
8  confer with me subsequent to this deposition, then?
9      MR. PHILLIPS: You have the right to meet and
10 confer on any issue, so I'd be happy to meet and confer.
11     MR. KLAUDT: Because if there are any
12 documents out there and if there have been any improper
13 objections, I'll have to reserve my right to keep this
14 deposition open and to continue it at a subsequent time.
15     MR. PHILLIPS: Sure. Let's get to the
16 deposition questions. We've had the response for some
17 time now and you've raised no issues with us before the
18 deposition, to my knowledge. So we're here, let's ask
19 questions and get that part over with.
20     MR. KLAUDT: Yeah, thank you. I got the
21 response on Friday.
22     MR. PHILLIPS: The document requests are
23 identical to the document requests that you served
24 several months ago, and we asserted the same objections
25 there as we did in the response to the deposition

Page 17

1  notice.
2      MR. KLAUDT: Okay. Well, I haven't had a
3  chance to compare them word for word -- or the
4  objections word for word, but if you say so, I'll go
5  back and look at them. I'm not going to argue with you
6  about it.
7      MR. PHILLIPS: I'm not either. That's why I'm
8  happy to get to the topics on the notice, because I
9  think that's why we're here.
10     MR. KLAUDT: Okay. Thank you.
11     Q   Ms. Whittaker, have you ever heard of
12 St. Joseph of Eureka?
13     A   Yes.
14     Q   Who owns St. Joseph Hospital of Eureka?
15     A   That would depend on how you define
16 "ownership."
17     Q   How would you define "ownership" in your
18 business?
19     MR. PHILLIPS: Vague and ambiguous and
20 overbroad.
21 BY MR. KLAUDT:
22     Q   You can answer.
23     MR. PHILLIPS: If you can.
24     THE WITNESS: The hospital is separately
25 incorporated. It is sponsored by the Sisters of

Page 18

1  St. Joseph. It is part of St. Joseph Health System and
2  as such, obtains corporate services through St. Joseph
3  Health System.
4      MR. PHILLIPS: Could you keep your voice up a
5  little bit because she's straining and it's because that
6  fan's over her head and it's drowning you out.
7  BY MR. KLAUDT:
8      Q   When you use the word "sponsored," what do you
9  mean?
10     (Mr. Glassman exited the proceedings.)
11     THE WITNESS: It's a term used in catholic
12 health care that denotes that the hospital is a ministry
13 of the Catholic Church sponsored by a congregation of
14 sisters, the Sisters of St. Joseph.
15     Q   And when you just told me that St. Joseph
16 Hospital of Eureka is a part of St. Joseph Health
17 System, can you explain that in more detail.
18     A   St. Joseph Health System is the corporate
19 member of St. Joseph Hospital.
20     Q   Is that the functional equivalent to saying
21 corporate owner?
22     MR. PHILLIPS: Objection; vague, lack of
23 foundation.
24     Go ahead.
25     THE WITNESS: We don't usually refer to it as

Page 19

1  ownership.
2  BY MR. KLAUDT:
3      Q   Why not?
4      A   Because in the nonprofit health-care world,
5  there are assets that are held by the hospital that are
6  not in any way owned by St. Joseph Health System. The
7  relationship, if you will, is one of reserved rights
8  held by a corporate member.
9      Q   Would it be fair to say that the corporate
10 member of St. Joseph Health System is an owner of
11 St. Joseph Hospital in Eureka?
12     A   Again, depending on how you define
13 "ownership."
14     Q   Okay. And what different definitions of
15 ownership do you use in your business as an officer of
16 St. Joseph Health System?
17     MR. PHILLIPS: Objection; vague, overbroad,
18 and exceeds the scope of the deposition notice.
19     THE WITNESS: You're expecting me to answer?
20 Could you repeat the question.
21     MR. KLAUDT: Sure.
22     Would you read the question back.
23     (Record read.)
24     THE WITNESS: I imagine the same definitions
25 that just about anybody would use as an attorney.

Page 20

5 (Pages 17 to 20)

BY MR. KLAUDT:

Q   And what are those?

MR. PHILLIPS: Objection; overbroad because there's no context to the question because it says "in your business," how do you define "ownership?" That's a very, very broad question. It goes well beyond any issue.

MR. KLAUDT: I'm going to ask you you refrain from speaking objections because they're inappropriate here.

MR. PHILLIPS: You can ask all you want. I'm going to continue. Go ahead.

MR. KLAUDT: If you want to continue your speaking objections, I'll raise it with the Court.

MR. PHILLIPS: That's fine. Go ahead. The phone's over there, Kent.

MR. KLAUDT: You can answer.

THE WITNESS: Ownership within health care can be through shareholders; it can be through sole corporate members; it can be through private ownership.

(Interruption in the proceedings.)

MR. KLAUDT: Off the record.

(Discussion off the record.)

BY MR. KLAUDT:

Q   Is the corporate member, St. Joseph Health System, an owner of St. Joseph Hospital of Eureka?

Page 21

---

MR. PHILLIPS: Objection; vague.

THE WITNESS: Depending on how you define it, it could be considered an owner.

BY MR. KLAUDT:

Q   Do you consider it to be an owner of St. Joseph Hospital of Eureka?

MR. PHILLIPS: Same objections.

THE WITNESS: No.

BY MR. KLAUDT:

Q   Why not?

A   Because we're the corporate member; we don't operate the hospital; we don't manage the hospital. We hold certain rights that are required under canon law and certain rights that are required by our bond convenance and certain rights that would be required by California law.

Q   What rights do you hold with respect to St. Joseph Hospital?

A   There are about 20 of them. I'm not sure I could list all of them. Some examples would include the right to approve the appointment of trustees to the St. Joseph Hospital board; the right to approve changes to articles and bylaws; the right to approve the purchase or sale of real estate property owned by St. Joseph Hospital; the right to approve budgets,

Page 22

---

long-term, short-term financing; the philosophy and charitable purpose of the hospital; the appointment of the hospital CEO — there are probably others that are not coming to mind.

Q   St. Joseph Health System has the sole authority to appoint the CEO of St. Joseph Hospital in Eureka; isn't that true?

A   We have a policy that requires input from the local board and that process would ultimately require approval by the St. Joseph Health System board.

Q   So St. Joseph Health System's board has the final say over the selection of a CEO for that hospital, correct?

A   Yes.

Q   Do you know who Joe Mark is?

A   Yes.

Q   Who is Joe Mark?

A   Current CEO of St. Joseph Hospital.

Q   How long has Joe Mark been the CEO of St. Joseph Hospital in Eureka?

A   I would say a little over a year; he was serving as interim CEO prior to that.

Q   When did he begin serving as interim CEO of St. Joseph Hospital of Eureka?

A   I'm not sure of the date.

Page 23

---

Q   Can you form an estimate as to the year or month?

A   I believe it was in late 2005.

Q   Do you know Mr. Mark personally?

A   Yes, I do.

Q   How often do you interact with him?

A   Perhaps once a month, twice a month.

Q   What are the nature of your interactions with Mr. Mark?

A   At meetings of our chief executive officers, I will see Mr. Mark; when we have a St. Joseph Health System board meeting, he will contact me if there are items to put on the agenda for approval.

Q   Who hired Mr. Mark in his capacity of CEO of St. Joseph Hospital of Eureka?

A   St. Joseph Health System.

Q   And who does Mr. Mark currently report to?

A   Currently reports to the chief operating officer of St. Joseph Health System.

Q   And who is that person at the present time?

A   Joe Randolph.

Q   Is Joe Mark a paid employee of St. Joseph Health System?

A   Yes.

Q   St. Joseph Health System writes his paychecks,

Page 24

---

6 (Pages 21 to 24)

1 right?
2    A   Yes.
3    Q   How many people are on the board of St. Joseph
4 Health System?
5    A   Currently there are 13.
6        MR. PHILLIPS:  13?
7        THE WITNESS:  Uh-huh.
8 BY MR. KLAUDT:
9    Q   Have you ever heard of something called
10 St. Joseph Health System of Humboldt County?
11   A   Yes.
12   Q   What is that?
13   A   It is a name, not a corporate entity.
14   Q   What does it do?
15       MR. PHILLIPS:  Objection; vague and overbroad
16 and exceeds the scope of the deposition notice.
17       THE WITNESS:  It doesn't do anything.  It is a
18 convenient term of reference for the two local
19 ministries that operate in Humboldt County.  They're a
20 part of St. Joseph Health System.
21 BY MR. KLAUDT:
22   Q   And those would be St. Joseph Hospital and
23 Redwood Memorial Hospital?
24   A   Yes.
25   Q   Any other entities that are part of St. Joseph

Page 25

1 Health System that are in the Eureka area?
2    A   No.
3    Q   So St. Joseph Health System of Humboldt County
4 is not a business association, correct?
5    A   Well, depends on how you define "business
6 association."
7    Q   Is it a partnership, a corporation, or sole
8 proprietorship?
9    A   No.
10   Q   None of those?
11   A   Huh-uh.
12   Q   Does it have any legal standing whatsoever?
13   A   No.
14   Q   When was it created?
15       MR. PHILLIPS:  Objection; foundation.
16       THE WITNESS:  It wasn't created.
17 BY MR. KLAUDT:
18   Q   It wasn't created?
19   A   No.
20   Q   So it's a handy label for the two entities in
21 Eureka that are sponsored by St. Joseph Health System;
22 is that a fair assessment of what St. Joseph Health
23 System of Humboldt County is?
24   A   One of those entities is in Fortuna, not
25 Eureka.

Page 26

1    Q   And that's Redwood Memorial Hospital?
2    A   Uh-huh.
3    Q   So St. Joseph of Humboldt County does not have
4 any employees, correct?
5    A   True.
6    Q   It doesn't pay taxes?
7    A   True.
8    Q   And it's not incorporated anywhere?
9    A   True.
10   Q   And it doesn't have any legal status
11 whatsoever so far as you're aware; is that correct?
12   A   The only legal status it might have is a
13 fictitious business name.
14   Q   Do you know one way or another if it is used
15 as a fictitious business name or is that your estimate
16 or —
17   A   It's my estimate.
18   Q   Okay.
19   A   I don't know that for a fact.
20   Q   What purpose does this name serve with respect
21 to the business of St. Joseph Health System?
22       MR. PHILLIPS:  Objection; to the extent that
23 it was asked and answered.
24       THE WITNESS:  Convenience.
25 BY MR. KLAUDT:

Page 27

1    Q   It's a convenient label for the two hospitals
2 that you just told me about, correct?
3    A   Yes.
4    Q   Any other purpose other than that?
5    A   Not that I can think of.
6    Q   Okay.  Have you ever heard Joe Mark describe
7 St. Joseph Health System as the owner of St. Joseph
8 Hospital of Eureka?
9    A   No.
10   Q   If he did make such a statement, would you
11 agree with that or disagree with that?
12       MR. PHILLIPS:  Objection; foundation,
13 speculation, incomplete hypothetical.
14       (Mr. Glassman entered the proceedings.)
15       THE WITNESS:  It's not my habit to take issue
16 with statements that our CEOs make unless I have a
17 significant problem with it.
18 BY MR. KLAUDT:
19   Q   What's the relationship between the Sisters of
20 Orange and St. Joseph Health System?
21   A   The Sisters of St. Joseph of Orange is the
22 sole corporate member of St. Joseph Health System and
23 also the catholic sponsors of St. Joseph Health System
24 that created St. Joseph Health System.
25   Q   And are the Sisters of St. Joseph of Orange a

Page 28

7 (Pages 25 to 28)

1   corporate owner of St. Joseph Health System?
2     A   As you've used the term previously, yes.
3     Q   Are there any other owners, other than the
4   Sisters of St. Joseph of Orange, of St. Joseph Health
5   System?
6     A   Not as you've used the term today, no.
7     Q   Under any other use of the term "ownership"
8   that you may employ in your business, could it be --
9   would there be any other owners of St. Joseph Health
10  System?
11       MR. PHILLIPS:  Objection; vague, lacks
12  foundation.
13       THE WITNESS:  The hospital is, as the Health
14  System is, a ministry of the Catholic Church.
15  BY MR. KLAUDT:
16     Q   What's the legal relationship between the
17  Catholic Church and St. Joseph Health System?
18       MR. PHILLIPS:  Objection; vague and overbroad.
19       THE WITNESS:  There's no formal legal
20  relationship under canon law, the law of the church.
21  There are requirements that a sponsored ministry have
22  certain rights reserved to the organization that
23  sponsors it.
24  BY MR. KLAUDT:
25     Q   But for purposes of California law, including

Page 29

1   California corporations law, there's no relationship
2   between the Catholic Church and St. Joseph Health
3   System; is that correct?
4       MR. PHILLIPS:  Objection.  Overbroad;
5   foundation; to the extent it calls for a legal
6   conclusion, which exceeds the scope of the notice.
7       THE WITNESS:  True.
8   BY MR. KLAUDT:
9     Q   True.
10      Have you told me everything that is
11  encompassed within your use of the term "sponsored" when
12  you refer to the sponsorship of St. Joseph Hospital of
13  Eureka by St. Joseph Health System?  Is there any other
14  meaning of "sponsored" as you've used it in your
15  testimony?
16       MR. PHILLIPS:  Objection; overbroad, lacks
17  foundation.
18       THE WITNESS:  There are a number of
19  definitions of sponsorship and I'm sure there are some
20  that I have not used today, but I would say the way I've
21  characterized it is a good summary.
22       MR. KLAUDT:  Okay.  I'd like to mark as 2 a
23  series of printouts.
24     (Deposition Exhibit 2 was marked for
25     identification by the court reporter.)

Page 30

1       MR. KLAUDT:  Off the record.
2     (Discussion off the record.)
3     (Ms. Delaney entered the proceedings.)
4  BY MR. KLAUDT:
5     Q   Handing you what's been marked as Exhibit 2,
6  I'll represent to you that I have printed these series
7  of pages --
8     (Discussion off the record.)
9  BY MR. KLAUDT:
10     Q   I'll represent to you that this is a series of
11  printouts from the St. Joseph Health System Web site.
12  And I'll ask if you have ever seen any of these pages
13  before?
14       MR. PHILLIPS:  Let me insert an objection that
15  the text on the right margin of the printout is cut off
16  so the document is incomplete.
17       But you can go ahead and answer.
18       MR. KLAUDT:  You're correct.  The document is
19  cut off and I tried to correct that and there was no way
20  to do it.
21       MR. PHILLIPS:  It's a total pain.
22       MR. KLAUDT:  It wasn't meant to confuse
23  anyone.
24       MR. PHILLIPS:  Oh, I'm sure.  I've had the
25  same problem myself.

Page 31

1       THE WITNESS:  Yes, I have seen the Web site.
2  BY MR. KLAUDT:
3     Q   Okay.  And with respect to page 1 on
4  Exhibit 2, do you see under "Geographic Information"
5  that St. Joseph Health System is described as existing
6  in Northern California, Southern California, Texas and
7  Eastern New Mexico?
8     A   Yes.
9     Q   Is that true and correct?
10     A   Yes.
11     Q   And under "Facilities," it lists "fourteen
12  hospitals, three home health agencies and" --
13  illegible -- "physician groups.  Do you see that?
14     A   Yes.
15     Q   Is that a true and correct statement?
16     A   Yes.
17       MR. PHILLIPS:  I'm going to object.  It
18  exceeds the deposition notice of the five topics listed.
19  BY MR. KLAUDT:
20     Q   And when the St. Joseph Health System's Web
21  site describes facilities as including 14 hospitals, is
22  one of those hospitals St. Joseph Hospital of Eureka?
23     A   Yes.
24     Q   Did you participate in drafting the content of
25  any of the Web pages on St. Joseph Health System's Web

Page 32

8 (Pages 29 to 32)

Esquire Deposition Services
800.770.3363

1  site?
2      A    No.
3      Q    And for purposes of this deposition, if I
4  refer to St. Joseph Health System as just "Health
5  System," will you agree that I'm referring to St. Joseph
6  Health System so I don't have to say all four words
7  every time?
8      A    That would be fine.
9      Q    Okay. Thanks.
10         Do you know who's responsible for drafting the
11  content of the St. Joseph Health System Web site?
12         MR. PHILLIPS:  Objection; exceeds the scope of
13  the deposition notice, calls for speculation.
14         THE WITNESS:  Our communications staff.
15  BY MR. KLAUDT:
16     Q    Okay. And who's in charge of that staff?
17         MR. PHILLIPS:  Same objection.
18         THE WITNESS:  Right now there's a new
19  individual who is responsible for that; that would be
20  Adriana Lynch.
21  BY MR. KLAUDT:
22     Q    And who was in charge of that staff before she
23  took that position?
24         MR. PHILLIPS:  Same objection.
25         THE WITNESS:  Carolyn Carter.

Page 33

1         MR. PHILLIPS:  Objection; lacks foundation,
2  argumentative.
3         MR. FINKEL:  Join.
4         MS. DELANEY:  Join.
5         THE WITNESS:  No.
6  BY MR. KLAUDT:
7      Q    Why not?
8         MR. PHILLIPS:  Objection; overbroad,
9  argumentative.
10         THE WITNESS:  Because, again, 14 hospitals
11  three home health agencies and multiple physician groups
12  that are licensed to provide care are affiliated with
13  St. Joseph Health System.
14  BY MR. KLAUDT:
15     Q    They're sponsored by the Health System,
16  correct?
17     A    Yes.
18     Q    And they may, in fact, be owned by the Health
19  System depending on your definition of "ownership,"
20  correct?
21     A    Yes.
22     Q    And under "Employees," this Web page lists
23  18,271 "full-time equivalents." Do you have any reason
24  to doubt that that's true?
25     A    I believe it's less than that now.

Page 35

1  BY MR. KLAUDT:
2      Q    Under the next heading, "Quality of care," do
3  you see where the sentence begins "SJHS is an industry
4  leader in providing quality care" -- illegible --
5  "hospital and home health entities are accredited by the
6  Joint Commission on Accreditation of Healthcare
7  Organizations"?
8      A    Yes.
9      Q    Is that a true statement?
10     A    Yes.
11     Q    What is the Health System's role in providing
12  quality hospital care in the state of California?
13         MR. PHILLIPS:  Objection; overbroad.
14         THE WITNESS:  St. Joseph Health System is not
15  licensed to provide any health care.
16  BY MR. KLAUDT:
17     Q    Then why does your Web site say that the
18  Health System is an industry leader in providing quality
19  hospital care?
20     A    The 14 hospitals, three home health agencies
21  and the physician groups provide health care and they
22  are affiliated with St. Joseph Health System.
23     Q    So would it be incorrect to say that
24  St. Joseph Health System is an industry leader in
25  providing quality hospital care?

Page 34

1      Q    What is your best estimate of the number of
2  employees of St. Joseph Health System?
3         MR. PHILLIPS:  Objection; exceeds the scope of
4  the notice.
5      I only see five topics on here, Kent. I don't
6  see how it ties into any of this.
7         THE WITNESS:  I would estimate it's a little
8  over 16,000 at the current time.
9  BY MR. KLAUDT:
10     Q    And how many of those employees are in Orange
11  County?
12         MR. PHILLIPS:  Objection; calls for
13  speculation, exceeds the scope of the deposition notice.
14         THE WITNESS:  I don't know the answer.
15  BY MR. KLAUDT:
16     Q    Can you form an estimate of that?
17         MR. PHILLIPS:  Same objection.
18         THE WITNESS:  It would be a very rough
19  estimate, maybe 5000.
20  BY MR. KLAUDT:
21     Q    And are those all in one office building or
22  facility in Orange County or spread around?
23     A    Spread around.
24     Q    How many buildings or facilities does
25  St. Joseph Health System have in Orange County?

Page 36

9 (Pages 33 to 36)

1     MR. PHILLIPS: Objection; speculation.
2     Counsel, I'd like you to tie this in to the
3 notice, because I'm not understanding how it relates to
4 the topics you've included in your deposition notice.
5     MR. KLAUDT: Well, ownership and control is
6 one of the topics that I noticed. And whether or not
7 St. Joseph Health System employs 18,000 people,
8 including possibly people at St. Joseph Hospital of
9 Eureka, is directly related to these topics so . . .
10     MR. PHILLIPS: You're asking about buildings,
11 Kent. Your question just asked about buildings.
12     MR. KLAUDT: Counsel, please don't interrupt
13 my deposition. I'm laying a foundation to ask where
14 these employees are located.
15     MR. PHILLIPS: I'm not interrupting. I'm
16 asserting proper objections, so continue.
17     MR. KLAUDT: If you have a legal objection,
18 make it.
19     MR. PHILLIPS: I just stated it.
20     MR. KLAUDT: Make your objection and stop
21 interfering with my deposition.
22     MR. PHILLIPS: I have. You're commenting.
23 Now continue.
24 BY MR. KLAUDT:
25   Q   You can answer the question.

Page 37

1   A   I don't know how many buildings. Many
2 buildings are located in Orange County.
3   Q   Okay. Where do the other 11,000 employees of
4 St. Joseph Health System work?
5     MR. PHILLIPS: Objection; speculation,
6 overbroad, exceeds the scope of the notice and puts a
7 smile on counsel's face.
8     THE WITNESS: First of all, they are not
9 employees of St. Joseph Health System; they are
10 employees of corporations that are affiliated with
11 St. Joseph Health System.
12     But the locations would be Northern California,
13 Southern California, Texas and Eastern New Mexico.
14 BY MR. KLAUDT:
15   Q   Including St. Joseph Hospital of Eureka,
16 correct?
17   A   Yes.
18   Q   Do you claim that the employees of St. Joseph
19 Hospital of Eureka are not employees of St. Joseph
20 Health System?
21   A   Yes.
22   Q   Then why does your Web site list 18,000-some
23 employees including employees of St. Joseph Hospital of
24 Eureka?
25     MR. PHILLIPS: Objection; argumentative and to

Page 38

1 the extent it's asked and answered.
2     THE WITNESS: I don't know.
3 BY MR. KLAUDT:
4   Q   Okay. Who would know the answer to that?
5     MR. PHILLIPS: Only if you know.
6     THE WITNESS: I don't.
7 BY MR. KLAUDT:
8   Q   If you wanted to find out why the Health
9 System's Web site listed 18,000 employees, who would you
10 go to to ask that or find out that information at
11 St. Joseph Health System?
12   A   I don't know.
13   Q   The next heading on that page is "Total net
14 revenue" and it lists total net revenue as $3.2 billion.
15 Do you see that?
16   A   Yes.
17   Q   Do you have any reason to disagree with that
18 statement?
19   A   No.
20   Q   Does that include revenue from St. Joseph
21 Hospital of Eureka?
22   A   Yes.
23     MS. DELANEY: No foundation that St. Joseph
24 hospital of Eureka generates revenue.
25     MR. KLAUDT: Would you like to be sworn in as

Page 39

1 a witness?
2     MS. DELANEY: I'm objecting on foundational
3 grounds.
4     MR. KLAUDT: Okay. You don't want to testify?
5     MR. PHILLIPS: Not yet.
6     Go ahead.
7 BY MR. KLAUDT:
8   Q   Looking at page 2 of Exhibit 2, the first
9 sentence under the heading "Facilities" indicates that
10 "St. Joseph Health System is an integrated healthcare
11 delivery system providing a broad range of medical
12 services. The system is organized into three regions –
13 Northern California, Southern California and West
14 Texas/Eastern New Mexico – and consists of 14 acute
15 care hospitals, as well as home health agencies, hospice
16 care, outpatient services, skilled nursing facilities,
17 community clinics, and physician organizations."
18     Do you see that statement?
19   A   Yes, I do.
20   Q   Is that a true and correct statement?
21   A   Yes.
22   Q   "The facilities that comprise SJHS offer a
23 wide variety of services within each of the three
24 regions."
25     Do you agree with that statement?

Page 40

10 (Pages 37 to 40)

Esquire Deposition Services
800.770.3363

1     A    Yes.
2     Q    And, in fact, on this page St. Joseph
3    Hospital -- well, it's cut off, so I won't ask you that
4    question because it's illegible, so let's move on to the
5    next one.
6     Q    Looking at page 4 of Exhibit 2, this Web page
7    lists St. Joseph Health System of Humboldt County and
8    describes it as "The first health care facility
9    established by the Sisters of St. Joseph in 1920"; is
10    that a true statement?
11     A    Yes.
12     Q    If the Health System does not own St. Joseph
13    Hospital of Eureka, who does?
14     A    The corporation, St. Joseph Hospital.
15     Q    The corporation, St. Joseph Hospital?
16     A    Uh-huh.
17     Q    Who owns the corporation St. Joseph Hospital
18    of Eureka?
19     A    As we've used that term today, St. Joseph
20    Health System.
21     Q    Thank you.
22       (Deposition Exhibit 3 was marked for
23       identification by the court reporter.)
24    BY MR. KLAUDT:
25     Q    Handing you what's been marked as Exhibit 3,

Page 41

1    it calls for speculation.
2       THE WITNESS:  To indicate they are affiliated
3    with St. Joseph Health System.
4    BY MR. KLAUDT:
5     Q    And that St. Joseph Health System is a sponsor
6    of the hospital, correct?
7       MR. PHILLIPS:  Objection; vague.
8       THE WITNESS:  A corporate member of the
9    hospital.  The sponsors of the hospital would be the
10    Sisters of St. Joseph of Orange.
11    BY MR. KLAUDT:
12     Q    And is that why in the lower right of
13    Exhibit 3 the name "A Ministry of the Sisters of
14    St. Joseph of Orange" is listed?
15     A    Yes.
16     Q    That indicates to people viewing this brochure
17    that St. Joseph Hospital of Eureka is affiliated with
18    the Sisters of St. Joseph of Orange, correct?
19     A    Yes.
20     Q    And that would indicate that St. Joseph of
21    Eureka is also sponsored by the Sisters of St. Joseph of
22    Orange, correct?
23     A    Correct.
24     Q    Is there any other purpose for listing the
25    Sisters of St. Joseph of Orange on brochures such as

Page 43

1    I'll represent to you that this is a brochure that was
2    made available to patients at the St. Joseph Hospital of
3    Eureka.  Have you seen this document before?
4     A    No.
5     Q    Have you seen any of the brochures of
6    St. Joseph Hospital of Eureka?
7     A    Yes.
8     Q    And what involvement, if any, have you had in
9    drafting any of those brochures?
10     A    None.
11     Q    Editing them or signing off on them?
12     A    None.
13     Q    Under what circumstances or in what context
14    have you seen patient brochures for St. Joseph Hospital
15    in Eureka?
16     A    As I went through the lobby of the hospital.
17     Q    Okay.  And were you aware that these brochures
18    identify St. Joseph Health System on the face of the
19    brochure such as that in Exhibit 3?
20     A    That's fairly typical.
21     Q    And why do the brochures at St. Joseph
22    Hospital of Eureka also have the logo and the name
23    St. Joseph Health System in the lower right in
24    Exhibit 3?
25       MR. PHILLIPS:  Objection; to the extent that

Page 42

1    that labeled on Exhibit 3?
2       MR. PHILLIPS:  Objection; to the extent it
3    calls for speculation.
4       THE WITNESS:  The Sisters have a reputation
5    for providing fine health care.
6    BY MR. KLAUDT:
7     Q    So this service serves a marketing function as
8    well, correct?
9     A    Yes.
10     Q    And an advertising function, correct?
11     A    Yes.
12     Q    And would that also be true of the logo and
13    name "St. Joseph Health System," that also serves a
14    marketing and advertising function?
15     A    In most communities, yes.
16     Q    And that would also be true in the Eureka
17    community, correct?
18     A    Yes.
19     Q    And that would be true --
20       MR. PHILLIPS:  Did you finish?
21       THE WITNESS:  No.  Because St. Joseph Health
22    System is not real popular in the Humboldt community, so
23    it is not a positive marketing influence.
24    BY MR. KLAUDT:
25     Q    And why is St. Joseph Health System not real

Page 44

11 (Pages 41 to 44)

1  popular in the Eureka community?
2      MR. PHILLIPS: Objection; to the extent it
3  calls for speculation.
4      THE WITNESS: A number of reasons: The Health
5  System was very much involved in the acquisition of
6  General Hospital, a competitor of St. Joseph Hospital.
7  And the medical community and some of the hospital
8  community resented the acquisition of General Hospital.
9      Q  When did the Health System acquire the General
10 Hospital in Eureka?
11     A  That was in -- I'm not sure of the date, but I
12 would say the year 2000, 2001.
13     Q  Does that hospital still exist?
14     A  As a corporation?
15     Q  As a hospital.
16     A  No.
17     Q  When was it closed?
18     A  It was not closed. The facility became part
19 of St. Joseph Hospital.
20     Q  Okay. And what is that facility known as
21 today?
22     A  St. Joseph Hospital.
23     Q  Okay. Who made the decision -- who at
24 St. Joseph Health System made the decision to acquire

Page 45

1  General Hospital in Eureka and turn it into St. Joseph
2  Hospital of Eureka?
3      MR. PHILLIPS: Objection; calls for
4  speculation, exceeds the scope of the notice.
5      MS. DELANEY: Foundation.
6      THE WITNESS: The Health System board approved
7  the acquisition.
8  BY MR. KLAUDT:
9      Q  And what does the term "acquisition" mean in
10 your business?
11     A  Purchase.
12     Q  When did the Health System purchase General
13 Hospital?
14     MR. PHILLIPS: Same objections.
15     MS. DELANEY: Objection; foundation.
16     THE WITNESS: Again, I believe it was in the
17 year 2000, sometime around there.
18 BY MR. KLAUDT:
19     Q  How much did the Health System pay for the
20 hospital?
21     MS. DELANEY: I object. Foundation, the
22 Health System paid.
23     THE WITNESS: I don't know.
24 BY MR. KLAUDT:
25     Q  Okay. Did they pay money for the hospital?

Page 46

1      A  Yes, they did.
2      Q  Okay. Can you form any estimate of how much
3  they paid for General Hospital?
4      MR. PHILLIPS: Let me just say to the extent
5  any of his questions, despite the fact they go beyond
6  the notice, ask you to reveal information you're
7  concerned about because it's financially sensitive, then
8  you tell me because we have a protective order in place.
9  So you just have to -- we'll have to rely on you to give
10 us that cue. Okay? Or we can take a break and circle
11 back to the question after we've had a chance to talk,
12 if that's important.
13     MR. KLAUDT: Or you can mark whatever portions
14 of the transcript you deem to be confidential after the
15 deposition without interrupting the deposition because
16 that's what the protective order says you can do.
17     MR. PHILLIPS: Don't give me those speeches,
18 Kent. I'm advising the witness because she needs the
19 help here. Okay?
20     MR. KLAUDT: You're coaching.
21     MR. PHILLIPS: She needs to know what the
22 protective order is about, Kent. I'm not coaching her
23 on anything. I'm not saying, "Don't answer."
24     Go ahead.
25     MR. KLAUDT: I'll object to you coaching the

Page 47

1  witness.
2      MR. PHILLIPS: The phone's over there, just
3  like I told you.
4      Go ahead, Susan.
5      MS. DELANEY: And I'm also going to object to
6  the question as vague, use of the term "they."
7  BY MR. KLAUDT:
8      Q  You can answer.
9      A  I don't know the acquisition price of General
10 Hospital.
11     Q  Going back to Exhibit 1, could you please take
12 a look at that. And looking at page 2 of Exhibit 1
13 which is the notice for this deposition, there are five
14 topics listed. And the first topic is: "The financial
15 relationship, including but not limited to budget, cost
16 and revenue issues, between Defendant St. Joseph
17 Hospital and Defendant St. Joseph Health System."
18     Do you see that?
19     A  Yes, I do.
20     Q  And you understand you've been produced as the
21 Health System's most qualified person to testify on this
22 topic?
23     A  Yes.
24     Q  Other than yourself, is there anyone at the
25 Health System that's more qualified than you to testify

Page 48

12 (Pages 45 to 48)

1  with respect to Topic 1?
2      MR. PHILLIPS: Objection; that's vague too.
3      THE WITNESS: I wouldn't say there's anyone
4  more qualified, perhaps equally qualified.
5  BY MR. KLAUDT:
6      Q   Who would that be?
7      A   Our chief financial officer.
8      Q   Who's that?
9      A   Darren Montalvo.
10     Q   How do you spell his last name?
11     A   M-o-n-t-a-l-v-o.
12     Q   And does he share your business address in
13 Orange at 500 South Main Street?
14     A   Yes, he does.
15     Q   Who determines the budget for St. Joseph of
16 Eureka?
17     A   St. Joseph Hospital of Eureka.
18     Q   Anyone else?
19     A   There is input from St. Joseph Health System's
20 staff and the St. Joseph Health System board approves
21 the consolidated budgets, not St. Joseph Hospital of
22 Eureka's budget, but the consolidated budgets.
23     Q   And what is the consolidated budget? Can you
24 describe that in layperson's terms.
25     A   It would be the budgeted revenue cost, capital

Page 49

1  expenditures of all local ministries within St. Joseph
2  Health System.
3      Q   And the Health System has final sign-off
4  authority on that budget, correct?
5      MR. PHILLIPS: Objection; misstates the
6  testimony.
7      THE WITNESS: Yes.
8  BY MR. KLAUDT:
9      Q   Who has the final authority on the budget for
10 St. Joseph Hospital of Eureka?
11     A   St. Joseph Hospital of Eureka's board.
12     Q   Who's on that board?
13     A   I could list some of the members. I don't
14 know that I know all of the current members.
15     Q   Are any of them employees of the Health
16 System?
17     A   Joe Mark as CEO, as an ex officio member of
18 the hospital's board.
19     Q   Any other employees of the Health System that
20 are on the board of St. Joseph Hospital of Eureka?
21     A   We have one individual who is a delegate of
22 the CEO of St. Joseph Health System who serves on the
23 board. Currently, that's Deborah Proctor, our CEO.
24     Q   What are Joe Mark's duties and
25 responsibilities as CEO of the hospital? When I use the

Page 50

1  term "hospital," will you agree that I'm referring to
2  St. Joseph Hospital of Eureka?
3      MR. PHILLIPS: Objection; vague, overbroad.
4      THE WITNESS: He's responsible for managing
5  the hospital, ensuring that its operations are
6  consistent with relevant law, ethical health care.
7  BY MR. KLAUDT:
8      Q   Is Joe Mark the person who is ultimately
9  responsible for quality assurance issues at the
10 hospital?
11     MR. PHILLIPS: Objection; vague.
12     THE WITNESS: I wouldn't characterize Joe Mark
13 as being responsible for quality assurance. That is
14 delegated to the medical staff.
15 BY MR. KLAUDT:
16     Q   Who delegates that to the medical staff?
17     A   Hospital's board.
18     Q   Including Joe Mark?
19     A   Yes.
20     Q   Is Joe Mark ultimately responsible for hiring
21 and firing decisions at the hospital?
22     MR. PHILLIPS: Objection; overbroad, vague and
23 argumentative.
24     THE WITNESS: Yes.
25 BY MR. KLAUDT:

Page 51

1      Q   Is Joe Mark ultimately responsible for all of
2  the policies and protocols in place at the hospital?
3      MR. PHILLIPS: Objection; vague, overbroad.
4      THE WITNESS: No. The medical staff has its
5  own policies that it adopts independent from Joe Mark.
6  BY MR. KLAUDT:
7      Q   Who's in charge of the medical staff at
8  St. Joseph Hospital?
9      A   The chief of staff.
10     Q   Okay. And who does that person report to?
11     A   The medical staff as a whole. That person
12 does not report to the CEO.
13     Q   Who is responsible for selecting the chief of
14 medical staff at the hospital?
15     A   The medical staff.
16     Q   How is that process implemented? How is that
17 selection made?
18     A   Usually it's an election.
19     Q   And who is the current chief of medical staff
20 at the hospital?
21     A   I don't know.
22     Q   Okay. Anything else that you would include in
23 Joe Mark's duties and responsibilities as CEO of the
24 hospital?
25     MR. PHILLIPS: Objection; vague and overbroad.

Page 52

13 (Pages 49 to 52)

1    THE WITNESS:  There are many more
2  responsibilities.
3  BY MR. KLAUDT:
4    Q    Are you aware of any documents that list or
5  describe Joe Mark's job duties and responsibilities?
6    A    There's a job description.
7    Q    Do you have that in your possession in your
8  office?
9    A    No.
10    Q    Who has that?
11    A    Our human resource department.
12    Q    Did you participate in drafting his job
13  description?
14    A    No.
15    Q    The second topic on page 2 of Exhibit 1 of the
16  depo notice is:  "Defendant St. Joseph Health System's
17  ownership of Defendant St. Joseph Hospital"; do you see
18  that?
19    A    Yes.
20    Q    We've discussed this question of ownership and
21  the meaning of "ownership" at length this morning,
22  correct?
23    A    Yes, we have.
24    Q    Okay.  With respect to this issue of
25  ownership, is there anyone other than yourself who you

Page 53

1  most knowledgeable on this topic?
2    A    Yes.
3    Q    In what ways does the Health System manage
4  St. Joseph Hospital of Eureka?
5    A    It does not.
6    Q    Not in any way whatsoever?
7    A    It has governance, reserved rights, but those
8  are not management.
9    Q    And have you listed prior -- have you already
10  listed all of those governance rights with respect to
11  St. Joseph Hospital of Eureka?
12    A    I think I stated that I did not list all of
13  them, but those that I could recall.
14    Q    Okay.  And there may be others that you don't
15  recall right now?
16    A    Yes.
17    Q    Okay.  Joe Mark is in charge of managing the
18  hospital, correct?
19    A    Yes.
20    Q    With respect to Topic 4:  "Any role played by
21  Defendant St. Joseph Health System in any staffing,
22  employment, or hiring decisions related to the Defendant
23  St. Joseph Hospital."
24        Do you have knowledge on this topic?
25    A    Yes, I do.

Page 55

1  believe has more knowledge than you have on this topic?
2    MR. PHILLIPS:  Objection --
3  BY MR. KLAUDT:
4    Q    Anyone at the Health System, that is?
5    MR. PHILLIPS:  Objection; foundation, vague as
6  to this topic.
7    THE WITNESS:  Not more knowledgeable, perhaps
8  equal knowledge.
9  BY MR. KLAUDT:
10    Q    Okay.  Who would that be?
11    A    A number of individuals.
12    Q    Okay.  Who are they?
13    MR. PHILLIPS:  Objection; overbroad.
14    THE WITNESS:  Our CEO, Deborah Proctor; our
15  chief operating officer, Joe Randolph; our general
16  counsel, Shannon Dwyer -- a number of other individuals.
17  BY MR. KLAUDT:
18    Q    The third topic on the depo notice is:  "The
19  managerial relationship between Defendant St. Joseph
20  Hospital and Defendant St. Joseph Health System."
21        Other than yourself, is there anyone at the
22  Health System who you believe has more knowledge on this
23  topic?
24    A    No.
25    Q    You would be the person most qualified and

Page 54

1    Q    And is there anyone other than yourself who
2  you believe has more knowledge on this topic?
3    A    No.
4    Q    What responsibility does Joe Mark have for
5  staffing decisions at the hospital?
6    A    He's ultimately responsible for staffing
7  decisions at the hospital.
8    Q    Do you recall that there was a layoff in 2006
9  at the hospital?
10    A    Yes.
11    Q    Whose decision was that?
12    A    Ultimately, Joe Mark's.
13    Q    Did the Health System provide input with
14  respect to that decision?
15    MR. PHILLIPS:  Objection; vague.
16    THE WITNESS:  I don't believe the Health
17  System provided input, no.
18  BY MR. KLAUDT:
19    Q    Did you participate in that decision in any
20  capacity whatsoever?
21    A    No.
22    Q    The fifth topic is:  "Any role played by
23  Defendant St. Joseph Health System in any quality
24  assurance or other patient care policies or procedures
25  related to Defendant St. Joseph Hospital."

Page 56

14 (Pages 53 to 56)

| | |
|---|---|
| 1    And do you have knowledge on this topic? | 1    Q    At all 14 hospitals? |
| 2    A    Yes. | 2    A    No, the staff at the Health System. |
| 3        MR. PHILLIPS:  Objection; vague. | 3    Q    Okay.  Just at the Health System? |
| 4        THE WITNESS:  Yes. | 4    A    Yes.  He supervises staff responsible for |
| 5    BY MR. KLAUDT: | 5    performance improvement initiatives, again, at the |
| 6    Q    And is there anyone at the Health System that | 6    Health System. |
| 7    has more knowledge than you have with respect to this | 7    Q    I guess my question was specifically with |
| 8    topic? | 8    reference to the 14 hospitals.  What role or |
| 9        MR. PHILLIPS:  Same objection. | 9    responsibility does Elliott Sternberg have? |
| 10       THE WITNESS:  There are people with equal but | 10       MR. PHILLIPS:  Same objections. |
| 11   not more. | 11       THE WITNESS:  As I stated before, he |
| 12   BY MR. KLAUDT: | 12   coordinates the gathering of information, benchmarking |
| 13   Q    Okay.  And who would those people be? | 13   it against national data, and identifies areas for |
| 14   A    Trisha Kassab. | 14   improvement, perhaps. |
| 15   Q    Spell her last name, please. | 15   BY MR. KLAUDT: |
| 16   A    K-a-s-s-a-b; Elliott Sternberg, our chief | 16   Q    Issues with respect to patient care? |
| 17   medical officer -- a number of other individuals. | 17       MR. PHILLIPS:  Objection; vague. |
| 18   Q    Are Ms. Kassab and Dr. Sternberg both working | 18       THE WITNESS:  Yes. |
| 19   in Orange County? | 19   BY MR. KLAUDT: |
| 20   A    Yes. | 20   Q    Is the Health System involved in any capacity |
| 21   Q    At your business address? | 21   whatsoever in efforts to improve the quality of patient |
| 22   A    Yes. | 22   care at the hospital? |
| 23   Q    And Dr. Sternberg's title is what? | 23       MR. PHILLIPS:  Objection; vague, overbroad. |
| 24   A    Chief medical officer. | 24       THE WITNESS:  Yes, relative to looking at |
| 25   Q    For the Health System? | 25   benchmark data. |
| Page 57 | Page 59 |

| | |
|---|---|
| 1    A    Uh-huh. | 1    BY MR. KLAUDT: |
| 2    Q    What job duties or responsibilities does he | 2    Q    For example, what kind of benchmark data are |
| 3    have with respect to any of the 14 hospitals that are | 3    you talking about? |
| 4    sponsored by the Health System? | 4        Are you talking about joint commission-type |
| 5        MR. PHILLIPS:  Objection; vague, overbroad, | 5    benchmark data on services? |
| 6    calls for speculation. | 6    A    That would be one, but there are |
| 7        THE WITNESS:  As chief medical officer, he | 7    benchmarking -- for example, the failure rate for |
| 8    puts in place benchmarking data, reports on how our | 8    providing Pneumovax upon admission; that's something |
| 9    hospitals compare based on national benchmarks.  He | 9    that Elliott tracks. |
| 10   coordinates the gathering of data, correlations between | 10   Q    So Dr. Sternberg would be involved in tracking |
| 11   data points; identifies sources for benchmarking. | 11   the performance of all 14 hospitals with respect to, for |
| 12   BY MR. KLAUDT: | 12   example, the Joint Commission on Accreditation |
| 13   Q    Anything else that you can think of that he | 13   reports; is that true? |
| 14   does with respect to the 14 hospitals? | 14   A    Yes. |
| 15   A    There are many things that he does, yes.  The | 15   Q    And including some other things that you've |
| 16   list could go on for quite some time. | 16   mentioned? |
| 17   Q    Okay.  Please keep listing them as you recall | 17   A    Yes. |
| 18   them. | 18   Q    Anything else that you can think of that fall |
| 19       MR. PHILLIPS:  Okay.  Objection; vague, | 19   within his responsibilities with respect to the 14 |
| 20   overbroad, exceeds the scope of the notice, calls for | 20   hospitals? |
| 21   speculation. | 21   A    Serving on one of our hospital boards. |
| 22       THE WITNESS:  He serves on one of our hospital | 22   Q    Which hospital? |
| 23   boards; he supervises the staff who is responsible for | 23   A    That would be Covenant Health System in Texas. |
| 24   quality measurements. | 24   Q    What's Trisha Kassab's job title? |
| 25   BY MR. KLAUDT: | 25   A    I believe she is an assistant vice president |
| Page 58 | Page 60 |

Esquire Deposition Services
800.770.3363

1  of clinical quality.
2      Q   And what does that mean?  What does she do?
3      A   She assists the hospitals in compliance with
4  Joint Commission standards; regulatory requirements,
5  state and federal.
6      Q   Other than Trisha Kassab, which other
7  employees or officers of the Health System are involved
8  with assisting St. Joseph of Eureka with respect to any
9  kind of patient care or quality assurance or
10  accreditation issues?
11      MR. PHILLIPS:  Objection; vague.
12      THE WITNESS:  Gosh --
13      MR. PHILLIPS:  Overbroad too.
14      THE WITNESS:  -- there are a number of
15  individuals that work in that department.  I'm not sure
16  I could give you the names of all of them.
17  BY MR. KLAUDT:
18      Q   Okay.  Would it be fair to say that there are
19  a number of individuals at the Health System that assist
20  St. Joseph Hospital with respect to those issues?
21      A   Yes.
22      Q   Can you estimate how many?
23      A   I would say the staff is eight people, maybe
24  ten.
25      Q   And those people regularly assist the 14

Page 61

1  hospitals including St. Joseph Hospital of Eureka with
2  respect to patient care and quality assurance and
3  accreditation issues, correct?
4      A   They do not assist relative to quality
5  assurance.  Quality assurance is performed at the
6  hospital with the medical staff.
7      Q   Okay.  Does Joe Mark have any responsibilities
8  with respect to quality assurance at the hospital?
9      A   For ensuring that it happens.
10      Q   Okay.  So he's ultimately the person
11  responsible for that issue?
12      MR. PHILLIPS:  Objection; overbroad, misstates
13  her testimony.  It's argumentative.
14      THE WITNESS:  The medical staff is responsible
15  for quality assurance at the hospital.
16  BY MR. KLAUDT:
17      Q   And Joe Mark is responsible for making sure
18  that quality assurance happens; is that what you said?
19      MR. PHILLIPS:  Objection; vague --
20      THE WITNESS:  Yes.
21      MR. PHILLIPS:  -- to the extent it misstates
22  her testimony.
23  BY MR. KLAUDT:
24      Q   And is it your contention that Joe Mark's only
25  involvement in quality assurance at the hospital is only

Page 62

1  to make sure it happens?
2      MR. PHILLIPS:  Objection; vague,
3  argumentative.  She doesn't have a contention.
4      THE WITNESS:  Joe Mark is not a licensed
5  medical professional.  It would be unreasonable to state
6  that he has responsibilities for quality assurance other
7  than to make sure it happens.
8  BY MR. KLAUDT:
9      Q   Okay.
10      MR. PHILLIPS:  Why don't we take five minutes.
11      MR. KLAUDT:  Sure.
12      (Recess.)
13      (Deposition Exhibit 4 was marked for
14      identification by the court reporter.)
15  BY MR. KLAUDT:
16      Q   What's been marked as Exhibit 4 is a series of
17  newspaper articles from the Times-Standard and I'll ask
18  you to take a look at that and tell me if you've ever
19  seen these newspaper articles before.  And I'll have
20  some questions about them.
21      Have you seen any of these articles?
22      A   Yes.
23      Q   Have you seen all of them?
24      A   No.
25      Q   Which ones have you seen before?

Page 63

1      A   I have seen the "Hospital for sale?" article.
2      Q   For the record that's Wednesday, April 5th,
3  2006 article within Exhibit 4.
4      A   I have seen the Saturday, April 29th, 2006,
5  "North Carolina company seeks to buy St. Joe" article.
6  I have seen the "74 layoffs at St. Joseph Hospital" on
7  Tuesday, May 16th, 2006.  The others, I have not seen.
8      Q   Well, let's at least, for now, focus on the
9  ones you have seen that you've just identified for us.
10  And beginning with the Wednesday, April 5th article
11  titled "Hospital for sale?" I think there's a photo of
12  Joe Mark there.  Do you see that?
13      A   Yes.
14      Q   And this references a press conference that
15  Joe Mark did in February of 2006.  Do you recall hearing
16  this press conference or reading a transcript of it?
17      A   No.
18      Q   Do you recall that it happened?
19      A   Yes.
20      Q   Were you involved in any way in organizing
21  that press conference?
22      A   No.
23      Q   What's your recollection of the purpose of the
24  press conference, if you recall?
25      A   As I understand it, Joe Mark was trying to

Page 64

16 (Pages 61 to 64)

Esquire Deposition Services
800.770.3363

1   engage the community such that the future of health care
2   in Humboldt County would be discussed in a broader
3   fashion and that the community would weigh in on whether
4   they wanted St. Joseph Hospital to remain part of
5   St. Joseph Health System, become independent, be sold.
6       Q   Okay. And the reason for this is because
7   there was some financial concern or I think it's been
8   called "a financial crisis" in some of these articles;
9   is that fair to say?
10      A   That was one of the reasons.
11      Q   What other reasons were there for considering
12  various proposals for sale of the hospital?
13      A   We had been approached.
14      Q   And you had been approached by a group out of
15  North Carolina?
16      A   HPA, that was the only group.
17      Q   Hospital Partners of America?
18      A   Uh-huh.
19      Q   Did they approach the Health System with
20  respect to discussing the purchase of the hospital?
21      A   I believe they approached one of the
22  investment bankers. And the investment banker
23  approached someone at the Health System.
24      Q   Okay. Do you know who was approached at the
25  Health System with respect to Hospital Partner's

Page 65

1   interest in possibly purchasing the hospital?
2       A   Joe Randolph.
3       Q   Okay. Now, as of the time Joe Mark gave this
4   press conference in February of 2006, he was an employee
5   of the Health System; true?
6       A   No.
7       Q   Who was his employer at that time?
8       A   He was an independent contractor to Navigant
9   Consulting.
10      Q   Who is Navigant Consulting?
11      A   A consulting firm that had been engaged to
12  provide interim leadership.
13      Q   And did they initially hire Joe Mark to be CEO
14  of the hospital?
15      A   No.
16      Q   Or did they find him for the Health System?
17      A   Yes.
18      Q   The latter?
19      A   Yes, the latter.
20      Q   Okay. So Navigant Consulting went out and
21  they're kind of a headhunter, something like that?
22      A   No, they're a consulting firm.
23      Q   And they went out and found candidates and
24  recommended Joe Mark for the Health System; is that a
25  fair assumption?

Page 66

1       A   That's my assumption.
2       Q   And the Health System hired Joe Mark?
3       A   The Health System contracted with Navigant
4   Consulting; Navigant Consulting had an arrangement with
5   Joe Mark.
6       Q   Would it be fair to say that the Health System
7   was paying Joe Mark's salary as of February 2006 via the
8   independent contractor relationship brokered through
9   Navigant?
10      A   Yes.
11      Q   There's a statement in the third paragraph of
12  the April 5th article attributed to Joe Mark. Begins
13  with "He said no decision has been made -- and the
14  decision would come from the Orange County-based
15  St. Joseph Health System."
16          Do you see that paragraph?
17      A   Yes, I do.
18      Q   Do you understand he's referencing the
19  decision whether or not to sell the hospital to a
20  potential buyer?
21      A   Yes.
22      Q   And do you have any reason to disagree that
23  the decision related to the sale of the hospital would
24  come from St. Joseph Health System?
25      A   Yes, with the reserved right held by the

Page 67

1   Sisters of St. Joseph of Orange.
2       Q   So any decision to sell the hospital would
3   ultimately come from both the Health System and the
4   Sisters?
5       A   Yes.
6       Q   Any one more than the other or both equally?
7       A   The Sisters have the final say.
8       Q   And the Health System had some say?
9       A   Yes.
10      Q   Okay. So you have no reason to disagree with
11  this statement attributed to Joe Mark other than what
12  you just clarified right now; is that fair to say?
13      A   Fair to say.
14      Q   Looking at Paragraph 5, he indicated at this
15  time that the community will "look at three possible
16  options: The Sisters of St. Joseph of Orange continuing
17  to own the hospital; a community-based model involving
18  local ownership; or a third party with sufficient funds
19  buying the hospital."
20          Do you see that paragraph? **"the" after colon
21  was not capped in article.
22      A   Uh-huh.
23      Q   Do you have any reason to disagree with the
24  statements attributed to Joe Mark in that paragraph?
25      A   No.

Page 68

17 (Pages 65 to 68)

1    Q   Now, looking at the April 29th, 2006 article,
2   which you indicated you have also seen, on the second
3   page of the article, I'm looking at the last sentence
4   and there's another statement attributed to Mr. Mark.
5       In this sentence: "He has said this could
6   include selling the hospital, keeping it under the
7   leadership of the Orange County-based St. Joseph Health
8   System or creating a community hospital district."
9       Do you see that?
10   A   Yes, I do.
11   Q   And do you have any reason to disagree with
12   the statements attributed to Joe Mark there?
13   A   No.
14   Q   And when Mr. Mark indicates that keeping the
15   hospital under the leadership of St. Joseph Health
16   System is one of the possibilities, do you know what he
17   means by the word "leadership"?
18       MR. PHILLIPS:  Objection --
19       THE WITNESS:  I can't speculate what Joe
20   meant.
21       MR. PHILLIPS:  Hang on a second.
22       Yeah, speculation -- calls for speculation
23   about what he said.
24   BY MR. KLAUDT:
25   Q   Has he ever used the term "leadership" in your

Page 69

1    MR. PHILLIPS:  Objection; overbroad, calls for
2   speculation, lacks foundation.
3       MS. DELANEY:  I join in those objections.
4       THE WITNESS:  I would not disagree with that
5   statement if Joe Mark said it in a press conference.  I
6   would take issue with that characterization.
7   BY MR. KLAUDT:
8    Q   If the Health System does not own the
9   hospital, why would Hospital Partners of America have to
10   approach the Health System through an investment banker
11   to discuss a possible purchase of the hospital?
12   A   That's how it's done, is my understanding.
13   Q   Wouldn't that process suggest that the Health
14   System owns the hospital?
15       MR. PHILLIPS:  Objection; speculation, vague.
16       THE WITNESS:  Perhaps.
17   BY MR. KLAUDT:
18   Q   The next article that you indicate you've seen
19   is the May 16th article titled "74 layoffs at St. Joseph
20   Hospital."
21       And we've briefly discussed this earlier
22   today.  What was the purpose of the layoffs, to your
23   knowledge?
24   A   To bring St. Joseph Hospital to staffing that
25   is more consistent with benchmarks nationally.

Page 71

1   presence with respect to describing the hospitals
2   relationship to the Health System?
3   A   I don't know.  He may have.
4   Q   Okay.  Would it be fair to say the Health
5   System is the leader of the hospital?
6       MR. PHILLIPS:  Objection; asked and answered
7   to the extent it is and it's also vague.
8       THE WITNESS:  I don't think so.
9   BY MR. KLAUDT:
10   Q   Why not?
11       MR. PHILLIPS:  Objection; asked and answered.
12       THE WITNESS:  The Health System provides
13   services; it provides economies of scale; it provides an
14   obligated group financing vehicle.  I don't know if that
15   would constitute leadership.  They're not operating the
16   hospital.
17   BY MR. KLAUDT:
18   Q   So you would not agree that the hospital is
19   under the leadership of the Health System, correct?
20       MR. PHILLIPS:  Objection; vague.
21       THE WITNESS:  Correct.
22   BY MR. KLAUDT:
23   Q   So if Joe Mark said that during this press
24   conference or at any other time, you would disagree with
25   that statement?

Page 70

1    Q   Was the hospital overstaffed?
2       MR. PHILLIPS:  Objection; vague.
3       THE WITNESS:  According to those benchmarks,
4   yes.
5   BY MR. KLAUDT:
6    Q   And on the second page of this article, I'm
7   looking at this paragraph.  Do you see this?
8    A   Uh-huh.
9    Q   There's a statement in the article that "The
10   California Nurses Association remains concerned about
11   the ongoing compromises in patient care and safety at
12   this facility," meaning St. Joseph Hospital of Eureka.
13       Do you see that statement?
14   A   Yes, I do.
15   Q   Did you ever have any contact with the
16   California Nurses Association on the subject of patient
17   care or safety at St. Joseph Hospital of Eureka?
18   A   No.
19   Q   Do you know whether or not anyone at the
20   Health System ever had such contact with the California
21   Nurses Association on that topic?
22   A   I don't know.
23   Q   Do you know whether Joe Mark did?
24   A   I would assume so . . .
25   Q   Have you seen any documents on the subject of

Page 72

18 (Pages 69 to 72)

1  the California Nurses Association's concerns about
2  patient safety at the hospital?
3      A   Yes.
4      Q   Which documents?
5      A   Articles in the newspaper; I believe CNA wrote
6  a letter -- those are the two I recall.
7      Q   To whom did they write a letter?
8      A   I don't know.
9      Q   Do you have a copy of that letter?
10     A   No, I don't.
11     Q   Do you know anyone at the Health System who
12  does?
13     A   I would imagine that Deborah Proctor would
14  have a copy of that.
15     Q   Any other documents other than this letter and
16  possible other news media stories on the subject of
17  CNA's concerns about patient care and safety at the
18  hospital?
19     A   Not that I know of.
20     Q   Did you ever discuss that subject with Joe
21  Mark at any time?
22     A   Which subject?
23     Q   The subject of CNA's concerns about patient
24  safety at the hospital.
25     A   Only in the context of him telling me about

Page 73

1  the concern that had been expressed in the newspaper.
2      Q   Okay. Are you aware of any of the details of
3  the CNA's concerns about patient safety at the hospital?
4      A   No.
5      Q   Have you seen any documents describing the --
6  with any specificity or any detail the types of concerns
7  that CNA had with patient safety?
8      A   CNA's concerns are for their constituents. I
9  have seen no detail about any patient safety concerns.
10     Q   Is CNA, in your experience, concerned with
11  patient safety as well?
12     A   It states it so.
13     Q   Do you have any reason to disagree with that?
14         MR. PHILLIPS: Objection; vague, lacks
15  foundation. It's overbroad.
16         THE WITNESS: My understanding of CNA's
17  interests are that they represent nurses. They're a
18  union and patient safety is certainly a concern, but not
19  their primary concern.
20  BY MR. KLAUDT:
21     Q   Did Joe Mark make the financial decision with
22  respect to the layoffs in 2006?
23         MR. PHILLIPS: Objection; vague.
24         THE WITNESS: Yes.
25  BY MR. KLAUDT:

Page 74

1      Q   Did you ever hear of any issue with respect to
2  a dispute concerning radiology services at the hospital
3  at any time?
4      A   Yes, I did.
5      Q   What did you hear about that?
6      A   I was general counsel at the time.
7         MR. PHILLIPS: Let me object to the extent it
8  seeks attorney-client work product information.
9  BY MR. KLAUDT:
10     Q   You can answer.
11         MR. PHILLIPS: No, she can't. I'm going to
12  take a break and discuss it with her.
13         MR. KLAUDT: Do you want to take a break now?
14         MR. PHILLIPS: If you want, why don't we break
15  for lunch?
16         MR. KLAUDT: Sure. Whatever you prefer.
17         (Lunch recess.)
18         (Record read.)
19         MR. KLAUDT: Are you going to instruct the
20  witness not to answer?
21         MR. PHILLIPS: I'll just make a brief
22  statement. It's my understanding that the witness was
23  serving as general counsel at the time the information
24  received by her would have been privileged. So on that
25  basis to the extent that any answer calls her to divulge

Page 75

1  attorney-client work product, I'm instructing her not to
2  answer. And she will follow that instruction.
3         (Instruction not to answer.)
4         MR. PHILLIPS: I have, however, made
5  representation to counsel that to the extent he has any
6  information available from the public domain -- I
7  recognize you don't have stuff with you today -- but if
8  he has something that he wants to inquire about, it's
9  around the edges that the witness feels comfortable
10  testifying about, that he can certainly ask his
11  questions.
12         And I also understand you may serve a follow-up
13  notice, which is your prerogative. Thank you.
14  BY MR. KLAUDT:
15     Q   Do you intend to follow your counsel's
16  instruction to not answer the question?
17     A   The question being?
18     Q   What do you know about the radiology services
19  dispute at the hospital?
20     A   I know quite a bit.
21     Q   Okay. And what can you tell me that -- strike
22  that.
23         What do you know about this subject that you
24  learned outside of your role as general counsel for the
25  Health System?

Page 76

19 (Pages 73 to 76)

1    A   A great deal of information.
2    Q   Let's start with a chronology then. Why don't
3  you tell me when you first heard about this dispute
4  concerning radiology services at the hospital.
5        MS. DELANEY: I'm going to object that it's
6  overly broad to say "dispute involving radiology
7  services." I mean, it implies there's something wrong
8  with the services as opposed to who's providing the
9  services.
10       MR. PHILLIPS: I have the same series of
11 objections in terms of just vague; lacks foundation;
12 calls for speculation.
13       But go ahead. Answer to the extent you can.
14       THE WITNESS: There is a medical group that
15 was an independent contractor to the hospital to be the
16 exclusive provider of radiology services. That contract
17 was coming up for renewal, I believe, in 2004. The
18 medical group made clear their plans to develop, own and
19 operate a freestanding imaging center that would be in
20 direct competition with the hospital.
21       There were discussions between hospital
22 administration and leadership of the medical group about
23 refraining from competing with the hospital, perhaps
24 doing a joint venture with the hospital and those
25 discussions carried on for -- approaching a year. When

Page 77

1  they did not result in resolution such that the hospital
2  and the group would be working together on this imaging
3  center, hospital administration at the time, Mike Purvis
4  gave notice to the group that renewal of the contract
5  would not occur and they would cease to be the exclusive
6  providers of radiology service.
7        This occurred far in advance of 2005, which I
8  understand was the year in issue. And my recollection
9  is that while the group exited the hospital -- and there
10 was animosity about that exit. The group was very
11 cooperative with the hospital about transitioning
12 radiology services to a new group. They did not want to
13 leave the patients in a lurch without radiology care.
14 They were there, handed off the care to a new group.
15       Ultimately, the imaging center did not do as
16 well as the group had hoped. The community of
17 physicians missed their old radiology buddies. And
18 there was a request that they be able to come back into
19 the hospital and they were able to work out an
20 arrangement whereby that could happen. And they came
21 back in the hospital, I believe, in early 2005.
22 BY MR. KLAUDT:
23    Q   What was Mike Purvis's job title at the time
24 this was happening?
25    A   Chief executive officer.

Page 78

1    Q   He preceded Joe Mark in that capacity, right?
2    A   Yes.
3    Q   Was there anyone between Mike Purvis and Joe
4  Mark?
5    A   No.
6    Q   What was the name of the medical group?
7    A   Humboldt Radiology Medical Group.
8    Q   Do you know their business address?
9    A   I don't. I believe they're located on Buhne.
10   Q   In Eureka?
11   A   Yes.
12   Q   Do you know who their CEO or owner or officer
13 is?
14   A   Dr. Pera.
15       MS. DELANEY: Off the record.
16       (Discussion off the record.)
17 BY MR. KLAUDT:
18   Q   And it's your recollection this issue was
19 resolved sometime in 2005; is that correct?
20   A   Early 2005.
21   Q   What was your involvement in this dispute
22 other than in your capacity as general counsel of the
23 Health System, if any?
24   A   Nothing.
25   Q   And you represented the Health System with

Page 79

1  respect to this dispute or disagreement or negotiation
2  at some time; is that correct?
3    A   I did not represent the Health System; I
4  represented St. Joseph Hospital.
5    Q   You represented the hospital with respect to
6  the radiology negotiation or dispute or however you care
7  to address it, correct?
8    A   Yes.
9    Q   Who retained you to represent St. Joseph
10 Hospital in that dispute?
11   A   There was no formal engagement. As general
12 counsel, I am employed to provide service to St. Joseph
13 Hospital among other local ministries.
14   Q   And that's part of your standard job
15 description at the Health System, correct?
16   A   It was when I was general counsel.
17   Q   Okay. And what were the years that you were
18 general counsel?
19   A   1997 through 2006.
20   Q   Other than Mike Purvis, was there anyone at
21 the hospital other than the hospital's lawyers who was
22 involved in negotiating or working on resolving this
23 radiology issue?
24   A   Yes.
25   Q   Who was that?

Page 80

20 (Pages 77 to 80)

1   A   Ann Orders.
2   Q   Last name?
3   A   O-r-d-e-r-s.
4   Q   Anyone else?
5   A   I think Ann and Mike were the only two I
6   worked with, so I couldn't say.
7   Q   What was Ann's job title at the time?
8   A   Chief operating officer.
9   Q   For the hospital or the Health System?
10  A   The hospital.
11  Q   Okay. Do you know where she is today?
12  A   I don't. She's no longer employed.
13  Q   No longer employed by the hospital?
14  A   By the hospital.
15  Q   Do you know if she lives in the state of
16  California?
17  A   Last I heard, she lived in Eureka, but I don't
18  know if she's still there.
19  Q   Do you know where she's working now?
20  A   I don't.
21  Q   How would you contact her if you had to?
22  A   I have her e-mail address at home.
23  Q   Okay. Do you stay in touch with her?
24  A   I did after she left St. Joseph Hospital to
25  assist her in finding new employment, but I've not

Page 81

1   spoken with her, had contact with her in quite some
2   time.
3   Q   Okay. What was her role or what was she doing
4   with respect to this radiology issue?
5   A   She would meet with Dr. Pera to discuss terms
6   of any kind of reconciliation.
7   Q   And as of 2005, who was the provider of
8   radiology services for the hospital?
9   A   Early 2005 it was Tahoe Carson Radiology
10  Medical Group and then Humboldt Radiology Medical Group.
11  Q   Anyone else?
12  A   Not as far as I'm aware of.
13  Q   And when did Humboldt Radiology Medical Group
14  take over in the capacity of providing radiology
15  services to the hospital?
16  A   I can't recall the exact date.
17  Q   Sometime in 2005?
18  A   Early 2005.
19  Q   Did you ever hear any complaints about the
20  quality or availability of radiology services at
21  St. Joseph Hospital?
22  A   No.
23  Q   Okay. Counsel has been kind enough to locate
24  an organizational chart during the break. I'd like to
25  mark this as next in order.

Page 82

1   (Deposition Exhibit 5 was marked for
2   identification by the court reporter.)
3   MR. PHILLIPS: When we've returned from the
4   deposition, I'll secure a clean copy of this and produce
5   it to you with Bates numbers.
6   MR. KLAUDT: Thank you. I appreciate that.
7   Q   Have you ever seen Exhibit 5 before?
8   A   Yes.
9   Q   What is it?
10  A   It's an org chart of St. Joseph Health System
11  and the ministries of the Sisters of St. Joseph of
12  Orange.
13  Q   And what information is indicated here with
14  respect to the relationship, if any, between St. Joseph
15  Health System and St. Joseph Hospital of Eureka?
16  A   Only the lines indicate relationship.
17  Q   What do they mean?
18  A   What we discussed earlier. That they are
19  local ministries for which St. Joseph Health System is
20  the corporate member and provides corporate services to
21  them.
22  Q   In the lower left-hand corner it indicates
23  that the Chart shows: All corporations of which the
24  Health System or the SJHS hospitals are corporate
25  members or stockholders.

Page 83

1   Do you see that?
2   A   Yes.
3   Q   Is that true?
4   A   Yes.
5   Q   And the chart does not show any ventures,
6   partnerships, or corporations for which SJSH affiliates
7   have ownerships with third parties; is that true?
8   A   Yes.
9   Q   Are there any such ventures, partnerships, or
10  corporations in which SJHS affiliates have ownership
11  with third parties that are owners or co-owners of
12  St. Joseph Hospital of Eureka?
13  MR. PHILLIPS: Objection; vague.
14  THE WITNESS: I don't think so.
15  BY MR. KLAUDT:
16  Q   So for example, there are no third-party
17  owners of St. Joseph Hospital of Eureka, correct?
18  A   Oh, definitely not. I'm sorry.
19  Q   Other than this chart, are you aware of the
20  existence of any other organizational charts depicting
21  any relationship whatsoever between the Health System
22  and the hospital?
23  A   There are org charts that indicate a dotted
24  line reporting relationship for the compliance officers
25  to the chief compliance officer of St. Joseph Health

Page 84

Esquire Deposition Services
800.770.3363

1  System.
2      MR. KLAUDT:  Could you read the answer back,
3  please.
4      (Record read.)
5  BY MR. KLAUDT:
6      Q   Anything else?
7      A   I believe that's it, that I know of.
8      Q   Do you have any organizational charts with
9  respect to St. Joseph itself?
10     A   I don't, no.
11     Q   Have you ever seen any?
12     A   No.
13     Q   For example, charts that would describe the
14 CEO, the hospital CEO's leadership or reporting
15 relationships or responsibilities -- anything like that?
16     A   No.
17         (Deposition Exhibit 6 was marked for
18         identification by the court reporter.)
19 BY MR. KLAUDT:
20     Q   Handing you what's been marked as Exhibit 6,
21 I'll represent to you this is the first two pages of an
22 insurance policy, i.e., the declarations and endorsement
23 page of an insurance policy.  It was produced to me by
24 your attorney last week.
25         Have you ever seen these documents before?

Page 85

1      A   Yes.
2      Q   What are they?
3      A   I'm sorry?
4      Q   What are they?
5      A   The declarations for insurance coverage for
6  those local ministries covered by American Unity Group.
7      Q   And page 2 on Exhibit 6 indicates that the
8  named insured includes the following:  Sisters of
9  St. Joseph of Orange, St. Joseph Health System, and
10 St. Joseph Hospital of Eureka, among others; is that
11 true?
12     A   Yes.
13     Q   Why does the Health Systems' insurance policy
14 also cover St. Joseph Hospital of Eureka?
15         MS. DELANEY:  Well, I object.  There's no
16 foundation for that.  It's also St. Joseph Hospital of
17 Eureka's policy.  It's a named insured.
18         THE WITNESS:  This is not St. Joseph Health
19 System's policy.  This is a policy that extends to all
20 of these organizations.
21 BY MR. KLAUDT:
22     Q   Who owns the policy?
23     A   American Unity Group issues it.  I don't know
24 that you could say that somebody owns it.
25     Q   Who pays the premium on the policy?

Page 86

1      A   All of the local ministries pay a premium.
2      Q   Does St. Joseph Health System pay any part of
3  the premium of this insurance policy?
4          MR. PHILLIPS:  Objection; speculation.
5          THE WITNESS:  I would imagine there's a
6  portion of the premium that would buy coverage for
7  St. Joseph Health System.
8  BY MR. KLAUDT:
9      Q   Do you know who negotiated the terms of the
10 insurance policy or the coverage for the Health System?
11     A   Not directly.
12     Q   How about indirectly?
13     A   I would assume that it would be Tom Mahowald
14 who was president of the American Unity Group.
15     Q   What employee of the Health System would have
16 been involved in purchasing this policy or negotiating
17 it?
18         MR. PHILLIPS:  Objection; speculation.
19         THE WITNESS:  Tom Mahowald.
20 BY MR. KLAUDT:
21     Q   He's an employee of the Health System?
22     A   Yes.
23     Q   And he's not an employee of American Unity
24 Group, correct?
25     A   Yes, he is.

Page 87

1      Q   He's an employee of both?
2      A   Uh-huh.
3      Q   What's American Unity Group?
4      A   I believe it's a captive insurance company,
5  sole shareholder of St. Joseph Health System.
6      Q   Okay.  I didn't understand that before.  Thank
7  you.
8          Does St. Joseph Hospital of Eureka have any
9  liability insurance other than the policy referenced in
10 Exhibit 6?
11         MR. PHILLIPS:  Objection; foundation,
12 speculation.
13 BY MR. KLAUDT:
14     Q   If you know.
15     A   There are layers of insurance that American
16 Unity Group arranges and those are with third-party
17 companies.
18     Q   And that's arranged through the Health System,
19 correct?
20     A   Yes.
21     Q   Okay.  I'm sorry.  What's his name again?
22     A   Tom Mahowald, M-a-h-o-w-a-l-d.
23     Q   What's his title?
24     A   I believe it's vice president, insurance
25 services.  His title has recently changed and he's now

Page 88

22 (Pages 85 to 88)

1  vice president of business development.
2      Q   Does the Health System provide medical
3  services?
4      A   No.
5      Q   Is the Health System a healthcare provider?
6      A   No.
7          (Deposition Exhibit 7 was marked for
8  identification by the court reporter.)
9  BY MR. KLAUDT:
10     Q   Looking at Exhibit 7, have you ever seen this
11 document before?
12     A   No, I have not.
13     Q   I'll represent to you that this was available
14 to the public at St. Joseph Hospital in Eureka sometime
15 in 2005 or 2006. Look at the first bullet point under
16 "Services and Service Area."
17         Do you see that?
18     A   Uh-huh.
19     Q   This indicates that "Included in St. Joseph
20 Health System - Humboldt County are:  St. Joseph
21 Hospital with two campuses, St. Joseph Hospital and
22 General Hospital Campus, and Redwood Memorial Hospital."
23         Is that a true statement?
24     A   Yes.
25     Q   And then the next sentence reads:  "We have

Page 89

1  over 244 physicians on our medical staff representing
2  nearly 32 specialties and subspecialties."
3          Is that a true statement?
4      A   As far as I'm aware.
5      Q   And that would have been true in 2005, to your
6  knowledge?
7      A   To my knowledge.
8      Q   And also in 2006?
9      A   Uh-huh.
10     Q   And the very bottom of this page under the
11 last bullet point, there's a sentence beginning with —
12 I'll read it into the record: "St. Joseph Health System
13 is actively pursuing a Continuous Quality Improvement
14 (CQI) initiative to help improve care and contain
15 patient costs."
16         Do you see that sentence?
17     A   Yes, I do.
18         MR. PHILLIPS:  Could you tell me where -- I'm
19 sorry.  Oh, I just found it.  I just found it.
20 BY MR. KLAUDT:
21     Q   Have you ever heard the term "continuous
22 quality improvement initiative"?
23     A   Yes.
24     Q   What is that?
25     A   The performance improvement responsibilities

Page 90

1  that I spoke of earlier.  This is the initiative that
2  includes certain objectives.
3      Q   And is that an initiative of the Health
4  System?
5      A   Yes.
6      Q   And the Health System began that initiative,
7  correct?  I'm assuming that —
8          MR. PHILLIPS:  Excuse me.  Can I belatedly
9  object?  I just want to make sure we're -- are you on
10 the Health System as you read it earlier or the Health
11 System general definition you agreed to at the outset of
12 the deposition?
13 BY MR. KLAUDT:
14     Q   When I say "Health System," I mean St. Joseph
15 Health System.  Do you understand that?
16     A   Yes.
17         MR. PHILLIPS:  I only asked because of what
18 you read earlier.  That's all.
19         MR. KLAUDT:  Thank you.
20     Q   Is this an initiative that was started by the
21 Health System?
22     A   There are CQI initiatives that had been
23 started by the local ministries long before the Health
24 System organized it, coordinated it.
25     Q   So whether or not the Health System started

Page 91

1  this initiative, this is something that the Health
2  System was actively pursuing at some point; is that
3  true?
4      A   Yes.
5      Q   And that would be true in 2005 and 2006?
6      A   Yes.
7      Q   And one of the purposes — at least one of the
8  purposes is to help improve patient care, correct?
9      A   Yes.
10     Q   What specific initiatives among the 14
11 hospitals can you think of that were a part of this CQI
12 initiative?
13         MR. PHILLIPS:  Objection; overbroad, exceeds
14 the scope of the notice.
15         THE WITNESS:  A number of initiatives that are
16 modeled after the CMS indicators.  I apologize.  This is
17 where it gets kind of complicated.  For example, the
18 failure rate for providing Pneumovax upon admission.
19 That is a CMS, the Center for Medicare and Medicaid
20 Services, a CMS benchmark.
21         There are other benchmarks included in the CMS
22 indicators and those are part of our CQI initiative.
23 BY MR. KLAUDT:
24     Q   And that CQI initiative applied to all 14 of
25 the hospitals in the Health System, correct?

Page 92

23 (Pages 89 to 92)

1    A    Yes.
2    Q    And that would have been true in 2005 and
3    2006?
4    A    Yes.
5    Q    The next sentence reads: "More than 1,400
6    people work for St. Joseph Health System - Humboldt
7    County, making it one of the largest employers in
8    Northern California."
9        Do you see that?
10    A    Yes, I do.
11    Q    Is that a true statement?
12    A    As far as I'm aware.
13    Q    Was that true in 2005 and 2006?
14    A    As far as I'm aware.
15    Q    Where did those 1400 people employed by
16    St. Joseph Health System - Humboldt County work?  At the
17    hospitals?
18    A    At the hospitals, yes.
19    Q    Redwood Memorial Hospital and St. Joseph
20    Hospital of Eureka?
21    A    Yes.
22    Q    Okay.  I guess I'm confused by this because, I
23    think, earlier in today's deposition, you told me that
24    St. Joseph Health System - Humboldt County existed in
25    name only and did not have any legally significant

Page 93

1    existence.  Can you help me understand that.
2    A    This is a convenient way to refer to both
3    hospitals.
4    Q    Okay.
5    A    St. Joseph Health System - Humboldt County
6    does not employ anyone.  The two hospitals which make up
7    this fictitious business name are the employers.
8    Q    Okay.  So I guess I'm trying to understand why
9    this handout says that more than 1400 people work for
10    St. Joseph Health System - Humboldt County if that's not
11    true?
12        MR. PHILLIPS:  Objection; lacks foundation,
13    argumentative and asked and answered.
14        MR. FINKEL:  Join.
15        MS. DELANEY:  Join.
16    BY MR. KLAUDT:
17    Q    Can you help me understand that?
18        MR. PHILLIPS:  Objection; vague.
19        MS. DELANEY:  Calls for speculation too.
20        THE WITNESS:  This is how these two hospitals
21    are referred to in Humboldt County collectively.
22    BY MR. KLAUDT:
23    Q    And who decided to refer to them in that
24    manner?
25    A    I believe it was the board of St. Joseph

Page 94

1    Hospital of Eureka.
2    Q    Do you know when that label "St. Joseph Health
3    System - Humboldt County" was first in use?
4    A    It was probably eight to ten years ago.
5    Q    And again, this handout, which has been marked
6    as Exhibit 7, has the logo of St. Joseph Health System
7    and the Ministry of the Sisters of St. Joseph of Orange
8    in the lower part of the page, correct?
9    A    Yes.
10    Q    And what's the reason for that?
11        MR. PHILLIPS:  Objection; asked and answered.
12        Go ahead.
13        THE WITNESS:  Our communication standards
14    require it.
15    BY MR. KLAUDT:
16    Q    What does that mean, your communication
17    standards require it?  Can you explain that.
18    A    We have a tagline that is required to be on
19    any official statements regarding the hospitals.  That
20    tagline is "A Ministry of the Sisters of St. Joseph of
21    Orange."
22    Q    And St. Joseph Health System?
23    A    It's not a tagline, but it is something that
24    is included.
25    Q    What's the purpose for doing that?

Page 95

1    A    I'd be speculating.
2        MR. PHILLIPS:  Okay.  Well, don't.
3    BY MR. KLAUDT:
4    Q    And I think you said earlier the
5    communications director would be the person to talk to
6    about why that's done?
7    A    Uh-huh.
8    Q    Is that right?
9    A    Uh-huh, yes, that's right.
10    Q    Okay.
11        (Deposition Exhibit 8 was marked for
12        identification by the court reporter.)
13    BY MR. KLAUDT:
14    Q    Exhibit 8 is another printout --
15    unfortunately, with some of the text on the right-hand
16    margin cut off -- again, from the St. Joseph Health
17    System Web site.
18        Have you ever seen this document before?
19    A    Not this document.  I've been on the Web site.
20    Q    Okay.  Looking at page 2 of Exhibit 8, there's
21    a little bio or description of Dr. Sternberg.  Do you
22    see that?
23    A    Yes, I do.
24    Q    And unfortunately, the text is cut off, but it
25    appears to say that his "major areas of responsibilities

Page 96

24 (Pages 93 to 96)

Page 97

```
 1  include oversight of SJHS patient safety." I'm assuming
 2  it's "safety." Do you know what that last word is?
 3      A   It is.
 4      Q   "And performance improvement."
 5      A   Yes.
 6      Q   Other than what you've already told me, what
 7  duties or responsibilities does Dr. Sternberg have with
 8  respect to patient safety and performance improvement at
 9  the 14 hospitals?
10      A   Other than what I've already told you --
11          MR. PHILLIPS: Objection; overbroad.
12          THE WITNESS: -- nothing else.
13  BY MR. KLAUDT:
14      Q   What does "performance improvement" mean in
15  the context of this description of his job duties on
16  Exhibit 8?
17          MR. PHILLIPS: Objection; speculation.
18          THE WITNESS: It refers to the Deming Model of
19  service, doing things smarter, more efficiently.
20  BY MR. KLAUDT:
21      Q   And on page 3 of Exhibit 8, you are described
22  as the senior vice president; do you see that?
23      A   Uh-huh.
24      Q   Is that different from or in addition to your
25  current job title as chief administrative officer and
```

Page 98

```
 1  governance counsel, or is that another way of describing
 2  the same thing?
 3      A   We have levels of executives and you could say
 4  that was part of my title, but I don't use it.
 5      Q   You use the title that you told me earlier:
 6  Chief administrative officer and governance counsel?
 7      A   Uh-huh.
 8      Q   So the fact that this says "senior vice
 9  president" doesn't reflect any change in your job
10  description or promotion or transfer or anything like
11  that?
12      A   I'm still a senior vice president, uh-huh.
13      Q   How long have you been a senior vice
14  president?
15      A   Since 1996.
16      Q   Have you ever been to the St. Joseph Hospital
17  of Eureka facility or facilities?
18      A   Yes.
19      Q   How many times?
20      A   Gosh, probably in excess of 30.
21      Q   Why do you go up there? What do you do when
22  you go up there?
23          MR. PHILLIPS: Objection; overbroad and vague.
24          THE WITNESS: In the past, I provided legal
25  advice; I will participate in board meetings of the
```

Page 99

```
 1  St. Joseph Hospital board; I will meet with
 2  administrative staff; I provide education to their
 3  nursing staff, medical staff; I provided introduction
 4  and education about compliance.
 5  BY MR. KLAUDT:
 6      Q   What type of compliance?
 7      A   Health care regulatory compliance.
 8      Q   Does St. Joseph Hospital of Eureka have its
 9  own internal or in-house legal counsel other than legal
10  services that you have provided to them?
11      A   No.
12      Q   Were you involved in the acquisition by the
13  Health System of St. Joseph Hospital of Eureka?
14      A   No.
15          MS. DELANEY: I'm going to object on
16  foundation grounds.
17  BY MR. KLAUDT:
18      Q   What hospital acquisitions were you involved
19  in for the Health System?
20      A   The acquisition of General Hospital.
21      Q   In Eureka?
22      A   Yes.
23      Q   Which came to be known as St. Joseph Hospital
24  of Eureka?
25      A   Uh-huh.
```

Page 100

```
 1      Q   What was your involvement in that acquisition?
 2      A   I was general counsel.
 3      Q   What specifically did you do with regard to
 4  that acquisition?
 5          MR. PHILLIPS: Objection; overbroad, exceeds
 6  the scope of the notice.
 7          THE WITNESS: I would provide counsel to the
 8  St. Joseph Hospital board, the St. Joseph Health System
 9  board; I provided oversight to the acquisition, but we
10  had outside counsel that was directly managing the
11  acquisition.
12  BY MR. KLAUDT:
13      Q   With respect to the Health System's
14  acquisition of General Hospital in Eureka, would
15  "purchase" be another word to describe "acquisition"?
16      A   I believe that I said that that was true some
17  time ago.
18          (Deposition Exhibit 9 was marked for
19          identification by the court reporter.)
20  BY MR. KLAUDT:
21      Q   Have you ever seen Exhibit 9 before?
22      A   Yes, I have.
23      Q   What is it?
24      A   "Humboldt County Task Force White Paper. A
25  review of options for future ownership of St. Joseph
```

Esquire Deposition Services
800.770.3363

1    Hospital, Eureka."
2        Q    Did you have any participation in serving on
3    this task force or in producing this white paper?
4        A    No, I did not.
5        Q    And it looks like the members of the task
6    force are listed on the first page of the white
7    paper; is that true?
8        A    Yes.
9        Q    And they include Andy Agwunobi, Dennis
10   Leonardi of the St. Joseph Health System - Humboldt
11   County Board of Trustees, and Harold Tool of the
12   St. Joseph Health System - Humboldt County, among
13   others.  Is that true?
14       A    Yes.
15       Q    Who selected the task force members for the
16   Humboldt County task force?
17       A    I believe it was Jack Irvine.
18       Q    Who's Jack Irvine?
19.      A    The chair of the task force.
20       Q    And the purpose of this white paper was to
21   describe this task force's review of options for future
22   ownership of the hospital, correct?
23       A    Yes.
24       Q    Looking at the third page of the exhibit, it's
25   Bates No. 104 under the "Executive Summary" in the

Page 101

1        Q    What does that mean?
2        A    Those that can't afford to pay for health care
3    or don't have insurance coverage for health care.
4        Q    Does that include Medi-Cal and Medicare
5    patients?
6        A    I wouldn't call Medicare a patient
7    marginalized; but a Medi-Cal patient, yes.
8        Q    When did the Health System or the Sisters or
9    the hospital make this commitment to serve marginalized
10   populations?  How long has this been a commitment of the
11   Health System or the Sisters?
12       A    As long as the Health System has been in
13   existence.  As long as the Sisters have been in
14   health-care ministry.
15       Q    Is that an important value of the Health
16   System?
17       A    Very important.
18       Q    And is that a very important value of the
19   Sisters?
20       A    Yes.
21       Q    And the hospital?
22       A    Yes.
23       Q    And that would have been true in 2005 and
24   2006, correct?
25       A    Yes.

Page 103

1    second full paragraph there's a sentence indicating that
2    "The conclusion of the Task Force is that the preferred
3    option is continued sponsorship of SJE," meaning
4    St. Joseph Hospital Eureka "by St. Joseph Health
5    System/Sisters of St. Joseph of Orange."
6        Do you see that?
7        A    Yes.
8        Q    Do you know when that conclusion was reached
9    by the task force?  Evidently, sometime in or prior to
10   August 2006, correct?
11       A    Yes.
12       Q    When did the task force make the
13   recommendations that it made in this white paper, if you
14   know?
15       A    I believe it was at the August meeting of the
16   St. Joseph Hospital board.
17       Q    Okay.  And following this paragraph, there's a
18   series of bullet-pointed rationales or reasons for this
19   recommendation.  Do you see that?
20       A    Yes.
21       Q    And one of them is that continued sponsorship
22   by the Health System "Will maintain commitment to serve
23   marginalized population."
24       Do you see that?
25       A    Yes.

Page 102

1        Q    Looking at Bates No. 106 within this exhibit,
2    there's reference to a Strategic Leadership Retreat on
3    April 29th, 2006.  Did you participate in that?
4        A    Yes, I did.
5        Q    And was the purpose of that to discuss the
6    ownership options under consideration for the hospital?
7        A    Yes.
8        Q    And did you, in fact, discuss the ownership
9    options for the hospital during this April 29th retreat?
10       A    Yes.
11       Q    Okay.  Who was on the St. Joseph Health
12   System - Humboldt County executive team at this time?
13       A    Joe Mark was interim CEO — well, actually, I
14   think, he had been formally appointed at that time, so
15   he was CEO; Howard Tull was interim CFO.  He is a
16   Navigant contractor; and at that time we had Johnny Cox
17   as the vice president of mission integration.  And that
18   would be the senior executive team.
19       Q    How about the Health System executive team;
20   who would be included in that?
21       A    That participated in this particular meeting?
22       Q    Yes.
23       A    Our senior vice president of mission
24   integration, Sister Jane Helmlinger; Deborah Proctor,
25   our CEO; and me.

Page 104

26 (Pages 101 to 104)

Esquire Deposition Services
800.770.3363

1   Q   Okay.  And then further on in this first
2   paragraph, the document indicates that "The three
3   ownership options were defined and the group was led
4   through a brainstorming session on the pros and cons of
5   each of the ownership options being considered."
6        And what were those three ownership options
7   that were defined?
8        MR. PHILLIPS:  Object to the extent it was
9   asked and answered in the previous answers.
10       THE WITNESS:  Yes.  It would be continued
11  sponsorship by the Sisters of St. Joseph and St. Joseph
12  Health System.  It would be a community-based model or
13  sale to a third party.
14  BY MR. KLAUDT:
15       Q   Okay.  So when you say "continued
16  sponsorship," that really means continued ownership,
17  correct?
18       MR. PHILLIPS:  Objection; foundation.
19       THE WITNESS:  As we've discussed it today?
20  BY MR. KLAUDT:
21       Q   Yes.
22       A   Yes.
23       Q   And the final recommendation after this task
24  force was formed and after this task force completed
25  this white paper was the Health System should continue

Page 105

1   its ownership of the hospital, correct?
2       A   Yes.
3       Q   This task force was appointed by SJHS Humboldt
4   County board chair, John Gierek, Jr.; is that true?
5       A   Yes.
6       Q   Where's his business address?
7       A   I don't know.  It's in Humboldt County.
8       Q   Is he an employee of the Health System?
9       A   No.
10      Q   Okay.  Who is his employer?
11      A   He is the president of Humboldt Moving and
12  Storage.
13      Q   Okay.  Has he ever been an employee of the
14  Health System?
15      A   No.
16      Q   And with respect to Bates No. 107 under
17  "Guiding Principles," there's another reference to the
18  guiding principles of the Sisters of St. Joseph.  And
19  No. 2 is to "Take into consideration the underserved and
20  marginalized."
21      Was that true in 2005 and 2006?
22      A   Yes.
23      Q   That that was a guiding principle of both the
24  Health System and the Sisters?
25      A   Yes.

Page 106

1   Q   And the hospital?
2   A   Yes.
3   Q   And looking at Bates No. 112 within the
4   exhibit --
5       MR. PHILLIPS:  Why don't you take a second and
6   get a drink if that's what you'd like.
7   BY MR. KLAUDT:
8   Q   Looking at the second bullet point from the
9   bottom, there was a mention of SJE --
10      And "SJE" within this document means St. Joseph
11  Hospital of Eureka, correct?
12      A   Yes.
13      Q   -- it mentions that the hospital is "affected
14  by high recruiting costs, nursing shortages and the loss
15  of important business lines (including radiology
16  coverage)."
17      Is this the radiology issue that we talked
18  about earlier today?
19      A   Uh-huh, yes.
20      Q   The loss of radiology coverage would have been
21  sometime in 2004 or 2005?
22      A   There was no loss of radiology coverage.  The
23  long-standing radiology group left affiliation with the
24  hospital.
25      Q   There was a transfer of responsibility for

Page 107

1   radiology coverage, correct?
2       A   Yes.
3       Q   Look at Bates No. 116 within the exhibit.  In
4   the second paragraph, third sentence, there is a mention
5   of an institutional reorganization, which occurred in
6   January of 2006.  Do you see that?
7       A   Uh-huh.
8       Q   What does that mean?
9       A   There was a restructure of the executive
10  management team and the layoffs occurred then.  The
11  layoffs included some managers.
12      Q   Whose decision was it to restructure the
13  management team?
14      A   Joe Mark, the CEO.
15      Q   Looking at Bates No. 129 within the exhibit,
16  do you have any of these documents listed as reference
17  documents in your possession?
18      Or in your office or . . .
19      A   I have the Retreat Summary, the first
20  document; I have the Humboldt County Options Case
21  Studies by Navigant; I do not have the Seismic Overview;
22  I do not have the Community Health Alliance Report; I
23  don't believe I have the final three documents, though
24  I've heard of them.
25      Q   Thank you.

Page 108

27 (Pages 105 to 108)

1        (Deposition Exhibit 10 was marked for
2        identification by the court reporter.)
3    BY MR. KLAUDT:
4        Q   Looking at Exhibit 10, have you ever seen this
5    document before?
6        A   No.
7        Q   I will represent to you that this is an
8    Application for Appointment to the Medical Staff at
9    St. Joseph Hospital that was produced in connection with
10   discovery in this action.
11       Do you know why the St. Joseph Health System
12   logo and name appear on this Application for Appointment
13   to the Medical Staff?
14       A   Because the logo and name appears on all
15   official documents.
16       Q   And that's the policy of the Health System?
17       A   Yes.
18       Q   And if I wanted to understand more about why
19   that's the policy of the Health System, you would refer
20   me to the communications department or communications
21   director as you discussed earlier?
22       A   Yes.
23       Q   Anyone else who would have more knowledge or
24   some knowledge or any knowledge about why the St. Joseph
25   Health System name and logo appear on documents such as

Page 109

1   that marked as Exhibit 10?
2        A   The logo communications director, Laurie
3    Watson-Stone.
4        Q   And who is she employed by?
5        A   St. Joseph Hospital of Eureka.
6        Q   Do you know who created this document?
7        A   I would assume medical staff services created
8    it. I don't know that for a fact.
9        Q   Whose medical staff services, the Health
10   System's or the hospital's?
11       A   The hospital.
12       MR. KLAUDT: I'm nearly done. Can we take a
13   five-minute break?
14       MR. PHILLIPS: Sure.
15       (Recess.)
16   BY MR. KLAUDT:
17       Q   How many people at the Health System are
18   involved in working on this CQI initiative that we just
19   discussed?
20       A   I think I estimated eight to ten.
21       Q   And do they work under the direction of
22   Dr. Sternberg?
23       A   Yes.
24       Q   At the beginning of today's deposition you
25   mentioned that you had testified in another deposition

Page 110

1    involving a medical negligence case against the Health
2    System is that -- no?
3        A   Well --
4        Q   In which the Health System was named.
5        A   The Health System was named.
6        Q   Do you recall the name of the plaintiff's
7    attorney in that case?
8        A   No.
9        Q   The name of the plaintiff's firm?
10       A   I don't. I'm sorry.
11       Q   Did Mr. Phillips represent you -- did
12   Mr. Phillips or his firm represent you at that
13   deposition?
14       A   No.
15       Q   Who represented you at that deposition?
16       A   The firm of Madory, Pleiss (sic) and Zell.
17       Q   Where are they located?
18       A   In Santa Ana.
19       Q   What city was your deposition taken in in that
20   matter?
21       A   In Santa Ana.
22       Q   And you don't recall the name of the case,
23   correct?
24       A   I could speculate, but I'm not positive.
25       Q   Can you spell it phonetically, the name of the

Page 111

1    plaintiff?
2        A   I believe it was Madigan, but I'm not positive
3    about that.
4        Q   How many plaintiffs were there, just one?
5        A   I don't know.
6        Q   M-a-t-t-i-g-e-n?
7        A   Madigan, M-a-d-i-g-a-n.
8        Q   M-a-d-i-g-a-n?
9        A   Uh-huh.
10       Q   Versus someone and the Health System?
11       A   Right.
12       Q   Who were the other defendants?
13       A   I believe one of the other defendants was
14   Heritage Health Care.
15       Q   Anyone else, any other defendants you know of?
16       A   Perhaps St. Joseph Hospital of Orange.
17       Q   And was your deposition in that matter noticed
18   by your name or as a person most knowledge or something
19   else?
20       MR. PHILLIPS: Excuse me. Exceeds the scope
21   of the notice. I'll object to all these questions.
22       THE WITNESS: I was the person most
23   knowledgeable.
24   BY MR. KLAUDT:
25       Q   On what subjects?

Page 112

28 (Pages 109 to 112)

1      MR. PHILLIPS: Same objection. Can I have a
2  running objection to this?
3      MR. KLAUDT: Sure.
4      MR. PHILLIPS: Okay.
5      THE WITNESS: On the involvement of St. Joseph
6  Health System in quality assurance.
7  BY MR. KLAUDT:
8      Q   In quality assurance at St. Joseph Hospital of
9  Orange?
10     A   And Heritage.
11     Q   What's Heritage Health Care?
12     A   It's a medical practice foundation organized
13 under California Corporations Code 1206D -- 1206L -- I'm
14 sorry.
15     Q   Did that case go to trial?
16     A   I believe so. St. Joseph Health System was
17 dismissed.
18     Q   Was the case tried in Orange County?
19     A   I believe so.
20     Q   In what year?
21     A   I don't know.
22     Q   Within the last five years?
23     A   I believe so.
24     Q   Was your deposition videotaped?
25     A   No.

Page 113

1      A   Exactly.
2      Q   Okay. Do you know a Dr. Kevin Molander?
3      A   No.
4      Q   How about a Dr. Ronald Cordova?
5      A   Huh-uh, no.
6      Q   How about a Dr. John Kelsey?
7      A   No.
8      Q   Ever heard of their names before other than in
9  conversations with your attorneys?
10     A   I read their names in reviewing the documents
11 for today.
12     Q   Okay. Where did you see their names other
13 than in the deposition notice?
14     A   In the deposition notice.
15     Q   Just in the deposition notice?
16     A   Uh-huh.
17     Q   Other than in conversations with your
18 attorney, have you ever heard of Allen Faron or any of
19 his injuries or complaints or medical records or
20 anything related to Allen Faron?
21     A   No, I've not.
22     MR. KLAUDT: That's all the questions I have
23 at this time.
24     MR. FINKEL: I don't have any questions.
25     MS. DELANEY: I have no questions.

Page 115

1      Q   And you did not testify at the trial of that
2  matter, correct?
3      A   No.
4      Q   Other than the involvement of the Health
5  System and quality assurance issues, were you testifying
6  in any other capacity or in any other topics in that
7  deposition?
8      A   A challenge had been made to production of
9  documents relative to quality. And I testified to the
10 fact that we had extensive documentation that would be
11 so voluminous as to be overwhelming and not relevant.
12     Q   Extensive documentation on the subject of
13 quality assurance at this particular hospital?
14     A   No. On quality.
15     Q   On quality?
16     A   Quality of care, not quality assurance at any
17 particular local ministry.
18     Q   What's the difference between quality
19 assurance and quality of care?
20     A   Quality assurance is a term that is used in
21 health care to refer to the protected discussion of
22 medical and nursing professionals in a very open manner
23 but protected to improve the quality of care at that
24 facility.
25     Q   Like a peer-review group?

Page 114

1      MR. KLAUDT: We're done. Thank you.
2      THE REPORTER: Okay. I just need any copy
3  orders to be on the record.
4      MR. KLAUDT: I'd like the regular condensed
5  ASCII. And what's your standard turnaround for a rough
6  draft?
7      THE REPORTER: I could get it to you by the
8  end of the week, if not sooner.
9      MR. KLAUDT: Can I have an e-mailed rough
10 draft. No rush, but just whenever you have one.
11     MR. PHILLIPS: I'll get a copy. Thanks.
12     MS. DELANEY: Copy and condensed.
13     MR. PHILLIPS: Yes, copy. That comes with a
14 disk, right?
15     THE REPORTER: Yes.
16     MR. FINKEL: I'd like a condensed also,
17 please.
18 //
19 //
20
21
22
23
24
25

Page 116

29 (Pages 113 to 116)

```
 1
 2
 3
 4
 5
 6
 7
 8
 9        I, SUSAN WHITTAKER, do hereby declare under
10   penalty of perjury that I have read the foregoing
11   transcript; that I have made such corrections as noted
12   herein, in ink, initialed by me, or attached hereto; that
13   my testimony as contained herein, as corrected, is true
14   and correct.
15        EXECUTED this_____day of_____,
16   20___, at_____, _____
             (City)          (State)
17
18
19
20        _____
           SUSAN WHITTAKER
21
22
23
24
25
                    Page 117
```

```
 1
 2
 3
 4        I, the undersigned, a Certified Shorthand
 5   Reporter of the State of California, do hereby certify:
 6        That the foregoing proceedings were taken
 7   before me at the time and place herein set forth; that
 8   any witnesses in the foregoing proceedings, prior to
 9   testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; further, that the foregoing is an accurate
13   transcription thereof.
14        I further certify that I am neither financially
15   interested in the action nor a relative or employee of
16   any attorney of any of the parties.
17        IN WITNESS WHEREOF, I have this date subscribed
18   my name.
19
20   Dated:_____
21
22
23        _____
           PAULINA BALBUENA
24        CSR. No. 12898, RPR
25
```

Esquire Deposition Services
800.770.3363

# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF HUMBOLDT

UNLIMITED JURISDICTION

---oOo---

ALLEN AND NANCY FARON,          )
                                )
            Plaintiffs,         )
                                )
      vs.                       )     Case No. CGC-06-454199
                                )
ST. JOSEPH HOSPITAL; ST.        )
JOSEPH HEALTH SYSTEM; EUREKA    )
COMMUNITY HEALTH CENTER; KEVIN  )
MOLANDER, M.D.; JOHN KELSEY,    )
M.D.; RONALD CORDOVA, M.D.; and )
DOES 1 through 50, inclusive,   )
                                )
            Defendant.          )
_____ )

**COPY**

**RECEIVED**

JAN 3 0 2007

PAUL, HASTINGS, JANOFSKY, LLP.

DEPOSITION OF ALLEN J. FARON

taken before DEBORAH E. JILKA, CSR

In and for the County of Sonoma

State of California

CSR No. 5942

Wednesday, January 10, 2007

DIABLO VALLEY REPORTING SERVICES
Certified Shorthand Reporters
2121 N. California Blvd., Suite 310
Walnut Creek, California  94596
(925)  930-7388

1     A.   I'd have to look at the date on my license.

2     Q.   Give me your best approximation.

3     A.   About a month and a half ago.

4     Q.   Do you drive a car now?

5     A.   Yeah.

6     Q.   Do you have your own car?

7     A.   I did.  I'm using my mom's car.

8     Q.   What happened to your car?

9     A.   Tranny dropped out.

10    Q.   Do you plan on buying another car?

11    A.   I plan on getting mine fixed eventually.

12    Q.   Are you right- or left-handed?

13    A.   Right.

14    Q.   Prior to coming here today into this room for

15 your deposition, did you read or review any materials?

16    A.   No.

17    Q.   Can you read?

18    A.   Not really that good.  I was in resource

19 English for most of my life.

20    MR. PHILLIPS:  Could I ask a favor?  I'm about

21 five feet away from down the table and I'm under a fan

22 that's blowing.  So I just need you to help me out a

23 little bit down here and keep your voice up.

24    MR. GALLOWAY:  Okay.

25    MR. KLAUDT:  Off the record.

16

DEPOSITION OF ALLEN J. FARON, January 10, 2007

```
 1              (discussion off the record)

 2      MR. GALLOWAY:  Back on the record.

 3          Can you read the last answer back, please.

 4                    (record read)

 5      MR. PHILLIPS:  Thank you.

 6      MR. GALLOWAY:  Q.  Tell me what you mean by

 7  resource English?

 8      A.    I have a learning disability, like I'll read

 9  something and I'll have to read it like over and over

10  again to understand it.

11      Q.    When were you first diagnosed as having a

12  learning disability?

13      A.    When I first started school back in

14  kindergarten.

15      Q.    Kindergarten?

16          And where did you go to go kindergarten?

17      A.    In Arizona.  I can't remember the school

18  though because it's been so long ago.

19      Q.    I understand.  What was the town?

20      A.    Prescott Valley.

21      Q.    Is that the same as Prescott, Arizona?

22      A.    It's the next town below.  Area code 86314.

23  For some reason I remember that all these years.

24      Q.    That's pretty good.  I can't even remember

25  mine.
```

                                                        17

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1          I'm going to ask you about where you lived and

2   moved around but let me just get a sense.

3          Can you tell me how old you were while you

4   were living in Prescott Valley, Arizona, from what age

5   to what age, approximately?

6      A.   I was born in Maine.  I lived there four

7   years.  So I moved to Arizona in '90.  So that made me

8   four years old.  I lived there until '99.  Right after

9   my birthday we moved from Arizona to here in '99.

10     Q.   What's "here," Eureka?

11     A.   Eureka.

12     Q.   Okay.  And you lived in Eureka ever since?

13     A.   Yeah, from '99 to present.

14     Q.   So let met go back and just follow up where we

15  left off.

16          To the best of your recollection, you were

17  diagnosed as having a learning disability as early as

18  kindergarten?

19     A.   Yes.

20     Q.   Do you remember at some point in time having

21  some testing with regard to your learning disability?

22     A.   IEP you mean?

23     Q.   That sort of thing, yes.

24     A.   Yeah.

25     Q.   Did you have IEPs?

                                                        18

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1    A.    Yeah.

2    Q.    Did you have those in Arizona?

3    A.    Yeah.

4    Q.    And after you moved to Eureka, did you have

5  any IEPs?

6    A.    Yeah, they put me.  They still had me in

7  resource, because I'm -- yeah.

8    Q.    And do you have any recollection in terms of

9  what type of learning disability you were thought to

10  have?

11    A.    Just reading.  Reading and writing.

12    Q.    Did somebody say you were dyslexic or did

13  anybody ever put a label on it that you can recall?

14    A.    Dyslexic.  I've heard people tell me I might

15  be dyslexic.

16    Q.    "Might be"?

17    A.    Yeah.

18    Q.    Okay.

19    A.    But nothing I can remember.

20    Q.    Okay.  We are going to talk to your mother

21  tomorrow.  Maybe she has some information on that, huh?

22    A.    She might.

23    Q.    In any event, to the best of your

24  recollection, you were always put in resource English?

25    A.    Yeah.

                                                      19

1    Q.    When you say "resource English," tell me what
2  you mean by that?
3    A.    It's lower than regular English, like it
4  just -- it be slower.  Like regular English they be
5  learning about something and we be about five chapters
6  behind and resource learning about stuff that they
7  haven't even done.  Like, it's just -- how would I
8  explain it?  It would just be for slower people I guess
9  I could say.
10   Q.    Can you write?
11   A.    Not that good.  I can't spell.
12   Q.    You can't spell?
13   A.    Yeah.
14   Q.    Let me just tell you.  As I go through this,
15  Mr. Faron, I'm not trying to embarrass you.  I just need
16  to ask questions.  You understand that?
17   A.    Yeah.
18   Q.    So because you can't spell, you really can't
19  write; is that true?
20   A.    Yeah.
21   Q.    And as an example, you can't -- in terms of
22  your reading abilities, for instance, you can't read a
23  newspaper?
24   A.    I can, but my reading ability is like fifth
25  grade.  That's what I've been told.

                                               20

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1     Q.   Who told you that?

2     A.   My -- in English class at Eureka High when I

3 was going there, we were reading -- the books we were

4 reading were fifth grade reading level.

5     Q.   Were you told by your teacher or someone

6 associated with Eureka High --

7     A.   Yeah.

8     Q.   -- that you had a fifth grade reading level?

9     A.   Teacher's assistants.  They went over my IEP.

10 It should be all in the school records.

11     Q.   Okay.  Let me just ask you a bit about

12 yourself.  Are you wearing a tongue ring, now?

13     A.   Yeah, I've always had it, but they made me

14 take it out when I was in the hospital.

15     Q.   Did you put it back in when you got out?

16     A.   I had it redone, yeah.

17     Q.   And it looks like, although you have your

18 collar buttoned up that you have a tattoo, at least the

19 one that I can see that sticks out on your left side.

20 What does that say?

21     A.   White boy.

22     Q.   White boy?

23     A.   Yeah.  I got it from a song.

24     Q.   That's the title of a song?

25     A.   Yeah.

21

1      A.    No, none of us have seen him in a while -- in

2   over 10 years.

3      Q.    Does your mother have any contact with him, to

4   your knowledge?

5      A.    No.  We don't know how to contact him.

6      Q.    How are you doing?  Do you want take a break

7   or are you all right?

8      A.    I'm all right.

9      Q.    Let me just go back and, if I can, cover your

10  education background.  You never graduated high school,

11  did you?

12     A.    No, I dropped out in 10th grade and I finished

13  the 10th grade at Pacific View Charter.  I'm pretty sure

14  I finished it because I dropped out of that when I was

15  working, too.  I was working and going to school at the

16  same time.  I decided that working was better.  I was

17  making money that way.

18     Q.    So you dropped out of Eureka High School?

19     A.    Yeah.  And went to CIS.  I transferred to

20  Center for Independent Study for 10th grade.  When I

21  turned 18, I couldn't continue going there.  So I had to

22  go to a charter school.  So I went to the Pacific View

23  Charter for about half a year.

24     Q.    Let me see if I can trace this a little bit.

25         You say you dropped out of Eureka High

                                                    39

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1   School in the 10th grade?

2       A..   Yeah, halfway through 10th grade.

3       Q.   So that would be your sophomore year?

4       A.   Yeah.

5       Q.   And you were about halfway through?

6       A.   Yeah.

7       Q.   Why did you drop out?

8       A.   Too many people.  I didn't get along with a

9   lot of teachers there.

10      Q.   Tell me what you mean by that.

11      A.   I wasn't -- a lot of my -- I was failing a lot

12  of my classes.

13      Q.   You were failing classes?

14      A.   Yeah.

15      Q.   Did somebody recommend that you drop out or

16  was that your decision?

17      A.   That was my decision, plus like there's a lot

18  of trouble kids at Eureka High and they are always

19  trying to mess with me.  I'm not like -- I'm not the one

20  to get in trouble so I just went to an independent

21  study.  So it's easier for me to study by myself.

22      Q.   So midway through your sophomore year in high

23  school when you dropped out, then you went to the Center

24  for Independent Studies in Eureka?

25      A.   Yeah, up at Zoe Barnum, but it's -- in Zoe

                                                        40

1   Barnum, but it's next door.  Not the adult ed., but it

2   was next to adult ed.  It's inside that room.

3        Q.    So you were at the Center for Independent

4   Studies for --

5        A.    Until I turned 18.

6        Q.    Until you turned 18?

7        A.    Which was half a year.  And then I graduated

8   from there.  And that was my 10th grade year.  I

9   finished 10th grade there.

10        Q.    So you finished the 10th grade at the Center

11   for Independent Studies?

12        A.    Yeah.  I'm pretty sure I did.  I received all

13   my credits I needed.

14        Q.    Did you get some certificate of completion?

15        A.    No.

16        Q.    But when you turned 18, you could no longer go

17   to that school; is that right?

18        A.    Yeah.  I tried going back and they are like

19   you're 18 you have to either go to adult ed. or a

20   charter school.  I went to adult ed. for three days and

21   I couldn't handle it so I switched over to charter

22   school.

23        Q.    Why couldn't you handle it?

24        A.    I just couldn't do it.  Too complicated for

25   me.

                                                        41

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1    Q.    Too hard?

2    A.    Yeah.

3    Q.    The curriculum was too hard?

4    A.    Yeah.

5    Q.    How long did you go to Pacific View Charter

6  School?

7    MR. GALLOWAY:  Do you want to take a break, Nancy?

8    MS. DELANEY:  Go ahead.

9    MR. GALLOWAY:  Okay.

10    A.    For about half a year, I'm pretty sure.  I'm

11  not exactly sure.

12    Q.    And you were starting the 11th grade, your

13  junior year?

14    A.    Yeah, I'm pretty sure I was.

15    Q.    But you never completed it, did you?

16    A.    Uh-uh (witness shakes head negatively).  I

17  needed like -- I think I needed 100 and something more

18  credits left to finish high school.

19    Q.    To finish high school?

20    A.    Yeah.

21    Q.    Or to finish the 11th grade?

22    A.    To finish high school.

23    Q.    I'm sorry if I just asked you this.  Do you

24  remember how long you went to Pacific View Charter

25  School?

                                                    42

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1    if I can.

2          It would appear that at some point in time you

3    were employed by Humboldt Child Care Council as a child

4    care worker?

5          A.   Oh, yeah.

6          Q.   And according to answers to interrogatories,

7    you were employed from November 2004 to January 2005.

8    So tell us a little bit, if you would, was that a job

9    for the county?  Was that Humboldt County?

10         A.   It was Humboldt Child Care Council.  I was a

11   provider.  I was taking care of three kids.

12         Q.   You were taking care of three children?

13         A.   Oh, wait.  No, two.  Jacob and -- two of them.

14         Q.   Don't cover your mouth, okay.  Because she has

15   to get that.

16         You were taking care of two children?

17         A.   Yeah.  While the mother worked.

18         Q.   While their mother worked?

19         A.   Yeah.

20         Q.   Where did you care for these children?

21         A.   At their house.

22         Q.   Did anybody else help you care for these

23   children?

24         A.   No.

25         Q.   And how old were the children?

45

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1       A.    I don't remember their -- I can't remember.

2       Q.    Did you know the children before?

3       A.    Yeah.

4       Q.    In other words, were they friends of the

5    family or something?

6       A.    My neighbor introduced me to them, and I

7    became friends.

8       Q.    What did you have to do in that approximate

9    three-month period or less?

10      A.    Just watch them, make sure they didn't get

11   into nothing and stuff.

12      Q.    And who paid you for that?

13      A.    Humboldt Child Care Council did.

14      Q.    And how much were you paid?

15      A.    I think each check was probably around 700,

16   $800 for the whole month, and I worked two months

17   straight because I never worked in January.

18      Q.    You didn't work in January at all?

19      A.    Uh-uh (witness shakes head negatively).

20      Q.    So you worked two months straight, November

21   and December of 2004?

22      A.    Yeah.

23      Q.    And what happened at the end of December; how

24   come you no longer worked for them?

25      A.    Because of MediCal, I wasn't -- they would

                                                          46

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1  stamps?

2      A.   Yes.

3      Q.   And when did you next go to work for somebody?

4      A.   I went into this program through Eureka High

5  and they got me a job at Sizzler's and they paid me -- I

6  think they paid for the first 20 hours I worked, and

7  after that, Sizzler's hired me.

8      Q.   Tell me about the program that you went

9  through through Eureka High.

10     A.   It was like a rehabilitation program.   It

11  was -- I was in Odyssey.   It is a program at Eureka High

12  where they help you get a job and stuff.   And they

13  referred me to these -- this person.   I can't remember

14  her name, but through the rehab. disability place.   And

15  she got me a job through the Sizzler's doing

16  dishwashing, and they paid for the first 20 hours.   And

17  then after that, it was Sizzler's choice to hire me or

18  not, and they decided to hire me because I was a good

19  worker.   And that's how I got the job as Sizzler's.

20     Q.   You said that you were in some type of rehab.

21  disability program?

22     A.   It was Department of Rehabilitation they sent

23  me to, but it was -- it was this person that worked

24  there that got me the job.   I don't remember her name

25  though.

                                                      49

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1    Q.    And the Department of Rehabilitation was

2  through the county of Humboldt?

3    A.    I'm pretty sure, yeah.

4    Q.    Or was it through the state?

5    A.    I don't know.

6    Q.    And after going through that program, you went

7  to work at Sizzler's and you were a dishwasher?

8    A.    Yeah.

9    Q.    Were you ever a busboy there?

10    A.    Once in a while I'd go out and bus tables, but

11  that wasn't my main job.  Dishwashing was.

12    Q.    And according to your answers to

13  interrogatories, it looks likes you were employed at

14  Sizzler as a dishwasher from March to July of 2005; is

15  that right?

16    A.    Yes.

17    Q.    And how was it or why was it that you stopped

18  working at Sizzler?

19    A.    'Cuz my neighbor, my friend, he got a job at

20  Hometown Buffet and he said that he could get me hired

21  there.  So I switched over and got hired at Hometown.

22    Q.    Did you lose your job at Sizzler?  Did you

23  quit or were you fired?

24    A.    I put in a two-week notice, but I got injured

25  during the two-week notice so I never actually went back

50

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1  to work there.  So I kind of -- I put in my two-week

2  notice, but I got injured so I only like worked a week

3  instead of two weeks and then I never went back.

4        Q.    How much did you make at Sizzler?

5        A.    Minimum wage, $6.75.

6        Q.    While you worked at Sizzler, how many hours a

7  week were you working?

8        A.    Between 20 and 30.

9        Q.    You didn't work full-time, did you?

10       A.    No.  They never had me work full-time.

11       Q.    I'm sorry?

12       A.    No, they never had me work full-time.

13       Q.    Did you receive any benefits?

14       A.    No.

15       Q.    Have you ever told anybody that you were fired

16 by Sizzler?

17       A.    No.

18       Q.    Your next job was at Hometown Buffet?

19       A.    Yes.

20       Q.    How long did you work there?

21       A.    About a month, but I went to -- I had a lot of

22 the sick days.  A lot of sick days.

23       Q.    You said that at some point in time while you

24 were working for Sizzler, you got injured.  What type of

25 injury did you have?

                                                    51

1      A.    It was on my day off.  Me and my friends was

2  playing and I fell and hurt my ankle.

3      Q.    Hurt your ankle?

4      A.    Yeah.

5      Q.    Did you seek any medical care for your injured

6  ankle?

7      A.    Yeah, I went to urgent care.

8      Q.    Who did you see?

9      A.    I don't know the name of the doctor.  They

10  just looked at my ankle and said it was just a minor

11  sprain.

12      Q.    Was that the first time you'd been to urgent

13  care?

14      A.    No.

15      Q.    Had you been to urgent care prior to that?

16      A.    Yeah.

17      Q.    Prior to the sprain?

18      A.    Yeah.

19      Q.    What other types of things had you sought

20  treatment for at your subsequent care, other than the

21  sprain?

22      A.    Skate boarding incidents.

23      Q.    Any others?

24      A.    Not that I can recall.

25      Q.    So you worked at Hometown Buffet for one

                                                          52

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1  month?

2      A.    Yeah, off and on, because I had a lot of sick

3  days.

4      Q.    And what was your capacity at Hometown Buffet?

5      A.    What does that mean?

6      Q.    What did you do?

7      A.    Dishwashing.

8      Q.    And how many -- strike that.

9            How much were they paying you as a dishwasher?

10     A.    Minimum wage, 6.75.  And I also had to bus

11 tables.

12     Q.    So you were making the same amount of money at

13 Hometown Buffet as you were making at Sizzler, minimum

14 wage?

15     A.    Yeah, but I was working I think an extra 10

16 hours a week more.

17     Q.    How many hours a week were you working at

18 Hometown Buffet?

19     A.    Probably 35, 40 hours a week.  I'm not exactly

20 sure about that one.  I know I worked a lot though.

21     Q.    And did you quit that job or were you fired?

22     A.    I walked out 'cuz I was sick and he wouldn't

23 let me go home sick so I walked out.

24     Q.    Your manager wouldn't let you go home?

25     A.    He was like "tough it out," and I couldn't

                                                        53

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1  tough it out because I was puking and stuff so I just

2  walked out and never went back.

3      Q.    It would appear from answers to

4  interrogatories that at some time after you worked at

5  Hometown Buffet, you worked at Jack In The Box?

6      A.    Yeah, about two-and-a-half weeks after I

7  walked out of Hometown, I got a job at Jack In The Box.

8  And I worked at Jack In The Box up until this incident

9  happened.

10     Q.    And what did you do at Jack In The Box?

11     A.    I was -- I did prep.  I did fryers,

12  maintenance.  Pretty much everything they had me doing.

13  Except front counter and the drive-through, I didn't do

14  that.

15     Q.    You didn't do drive-through?

16     A.    No, I refused.

17     Q.    Why did you refuse?

18     A.    Because the computers, I -- I don't do

19  computers.

20     Q.    I understand.

21           When you say prep., do you mean preparing

22  food?

23     A.    Yeah.  I like prepped.  Made the salads, made

24  the setups for everything.  Like for the breakfast

25  burritos, I did the setups for that and all that.

                                          54

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1    Q.    And ran the fryers for the french fries?

2    A.    For lunch I ran fryers with tacos and whatever

3 else they fried.

4    Q.    You said you did some maintenance, what does

5 that involve?

6    A.    Cleaning the bathrooms, doing the parking lot,

7 picking up the cigarette butts in the parking lot,

8 making it presentable.

9    Q.    And according to answers to interrogatories,

10 you worked there from September 2005 to

11 January 14, 2006?

12    A.    Yeah, 'cuz I was sick and I never got fired

13 there.  I just got sick and I ended up in the City,

14 so --

15    Q.    Ended up at U.C.?

16    A.    Yeah.

17    Q.    Have we now covered your work history?

18    A.    Yeah.

19    Q.    Have you had any jobs since you last worked at

20 Jack In The Box?

21    A.    No.

22    Q.    When you had those jobs that you told us about

23 at Sizzler and Hometown Buffet and Jack In The Box, did

24 your working in any way affect your mother getting food

25 stamps?

                                                    55

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1      MR. KLAUDT:  Object that it calls for speculation.

2           You can answer if you know.

3      A.   Not that I know.  Because I was working under

4  40 hours a week.

5      MR. GALLOWAY:  Q.  In other words, if you worked

6  under 40 hours a week, was it your understanding that it

7  wouldn't affect the food stamps?

8      MR. KLAUDT:  Same objection.

9      A.   Yeah.

10     MR. GALLOWAY:  "Yes"?

11     A.   Yeah.

12     Q.   "Yes"?

13     A.   Yeah.

14     Q.   Okay.

15          And likewise, did your working at either at

16  Sizzler or Hometown Buffet or Jack In The Box affect

17  your personal MediCal eligibility?

18     A.   Not that I know of.

19     Q.   Why was it that there was a problem with

20  Humboldt Child Care and there wasn't, to your knowledge,

21  with Sizzler or Hometown Buffet and Jack In The Box?

22     A.   Because I was making a lot at Humboldt Child

23  Care.  I was working way over 40 hours a week and stuff.

24  That's why.

25     Q.   You were making too much money?

                                                    56

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1      A.   Yeah.

2      Q.   And the other jobs you weren't making enough

3  that it affected your MediCal eligibility?

4      A.   Yeah.

5      Q.   Did you have some understanding, for instance,

6  when you worked at Jack In The Box in terms of hours or

7  amounts that you could earn which would affect your

8  MediCal eligibility?

9      A.   Not that I know of.

10      Q.   Since you worked at Jack In The Box -- I think

11  you just answered this and I'm sorry -- you haven't gone

12  to work anyplace else?

13      A.   No.

14      Q.   Have you applied for work anyplace?

15      A.   I applied at the 76 station, but I knew that

16  they wouldn't hire me.

17      Q.   Which 76 station did you apply at?

18      A.   The one on in McKinleyville.  But I knew they

19  wouldn't hire me.  Because they weren't hiring and I was

20  just bored and filled out an application.

21      Q.   When did you fill out this application to work

22  in the gas station in McKinleyville; how long was that?

23      A.   Three or four months ago.

24      Q.   And when you filled out that application for

25  employment at the gas station -- you say it's a 76?

                                                    57

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1    A.    Yeah.

2    Q.    -- did you feel you could do the work there?

3    A.    Pumping gas, yeah.

4    Q.    You thought you could?

5    A.    Yeah.  Just sitting -- all they do is sit in

6 the little office and when someone pulls up, they pump

7 gas and take cash.  I figured I could do that much.

8    Q.    What did they pay there?

9    A.    I think minimum wage.  I'm not exactly sure.

10    Q.    Did you know anybody that worked there?

11    A.    My friend previously worked there a year or

12 two ago and he said it's a kickback, easy job, but I

13 wouldn't know because I never got hired.

14    Q.    Did they tell you they weren't hiring?

15    A.    They were hiring but they were looking for

16 someone not like -- they were looking for someone not

17 like -- I put down all my disabilities.  That's probably

18 why they didn't hire me because I'm still on SSI and

19 stuff.

20    Q.    In other words, if you went to work, do you

21 run the risk of losing SSI?

22    A.    Well, what I've heard is if I went back to

23 work, every dollar I make they cut 50 cents out of my

24 SSI or something like that.

25    Q.    Who's told you that?

58

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1      Q.    Who would know that, your mom?

2      A.    My mom, yeah.

3      Q.    Do you have a person that's associated or

4  employed by the State of California that works with

5  MediCal benefits that you personally deal with?

6      A.    I don't know.

7      Q.    Let me ask the question the other way around.

8  Have you personally been out of pocket any money?  Have

9  you had today pay any money for the medical care that

10  you received at UCSF?

11      A.    No.

12      Q.    And let me back up all the way.  I know that

13  at some point in time you were transported down here to

14  the Bay Area by air transport for medical care; is that

15  true?

16      A.    Yeah.

17      Q.    Was it a Life Flight -- was it a flight or a

18  helicopter?

19      A.    I think a Life Flight.

20      Q.    Airplane?

21      A.    Yeah.

22      Q.    You didn't have to pay for that, did you?

23      A.    No.

24      Q.    Paid for by MediCal?

25      A.    They sent us a bill but I believe MediCal took

                                                    64

DEPOSITION OF ALLEN J. FARON, January 10, 2007

1  care of it.

2      Q.    To your knowledge, you didn't pay any of that,

3  did you?

4      A.    No.

5      Q.    What about for medical care in Eureka, did

6  MediCal, to your knowledge, pay for all of that?

7      A.    Yeah, I wrote down that I had MediCal for

8  insurance, so everything I'm assuming got sent there.

9      Q.    So to your knowledge as you sit here now, Mr.

10  Faron, you don't believe that you personally are out of

11  pocket any money for any of the medical care that you

12  received either in Eureka or down here at UCSF; is that

13  true?

14      A.    Yeah.

15      Q.    Now, I understand you're currently having

16  medical care and treatment and I want to talk about that

17  in a minute.  And I think this is clear on the record.

18  You have never had any policy of health insurance

19  through a private company like Blue Cross, Blue Shield,

20  anything of that nature, true?

21      A.    True.

22      MR. KLAUDT:  Asked and answered.

23      MR. GALLOWAY:  I think I did and I apologize.  I

24  must be getting hypoglycemic here.

25      Q.    Is that true?

                                                        65

DEPOSITION OF ALLEN J. FARON, January 10, 2007

# EXHIBIT C

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF HUMBOLDT

UNLIMITED JURISDICTION

ALLEN FARON,

               Plaintiff,

   vs.                  No. DR070032 (former

                             San Francisco Superior

                             Case Number

                             CGC-06-454199)

ST. JOSEPH HOSPITAL; ST. JOSEPH

HEALTH SYSTEM; KEVIN MOLANDER,

M.D.; JOHN KELSEY, M.D.; RONALD

CORDOVA, M.D.; and DOES 1 through      **CERTIFIED COPY**

50, inclusive,

               Defendants.

_____/


DEPOSITION OF SUE RHEE, M.D.

March 19, 2007


Reported by:

Natalie Y. Botelho

CSR No. 9897

**LEGALINK**®

A MERRILL
COMMUNICATIONS
COMPANY

575 Market St
11th Floor
San Francisco, CA 94105

tel (415) 357-4300
tel (800) 869-9132
fax (415) 357-4301

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1    that?

2    A.        Generally there's some parameters with regards

3    to amount of bowel that's left and their chances of

4    being able to get off of TPN.  They're not hard and fast

5    rules by any means.  It's just kind of a guideline.  And

6    with the amount that he has left, he falls into that

7    range where he may or may not get off of TPN.

8    Q.        Okay.  So would it be fair to say that, based

9    upon your current understanding of his status, you don't

10   know if he will ever get off TPN in the future?  It's

11   too soon to tell?

12   A.        Can you repeat that?

13   Q.        Yeah.  Do you have any understanding of

14   whether he will ever get off of TPN at any time during

15   the rest of his life?

16   A.        I don't know.

17   Q.        Okay.  And that will depend upon how his bowel

18   does in the future?

19   A.        Right.

20   Q.        Okay.  And that's part of the reason you're

21   monitoring him every three months?

22   A.        Right, right.

23   Q.        Would it be fair to say that you are the

24   person who's most knowledgeable at UCSF about his short

25   gut syndrome?

                                                          24

SUE RHEE, M.D.    March 19, 2007

1    A.       His in particular?

2    Q.       Yeah.  Or the doctor here who's following his

3    short gut syndrome most closely?

4    A.       Yes, yeah, that's fair to say.

5    Q.       And does Dr. Nobuhara have any involvement in

6    the TPN prescription, or is her role just limited to his

7    surgical procedures?

8    A.       For the past few visits, we've seen him

9    together, so it's, I think, more of a discussion between

10   the two of us.

11   Q.       So Dr. Nobuhara continues to follow his case

12   and be involved in it?

13   A.       Correct.

14   Q.       Okay.  And what is her role in following his

15   case, if you know?

16   A.       Her role, I believe, is for surgical

17   follow-up.

18   Q.       Okay.  And do you know whether or not she's

19   recommended or considered any additional surgeries?

20   A.       I don't know.

21   Q.       Has that been discussed at all?

22   A.       I don't believe so, not at our last visit.

23   Q.       Do you have any prognosis for the progression

24   of his short gut syndrome at this time?

25   A.       Prognosis with regards to...?

25

SUE RHEE, M.D.    March 19, 2007

1    layperson's terms?

2    A.        So there's some association of long-term TPN

3    use and the development of liver disease.

4    Q.        And what type of liver disease, if you can

5    describe that?

6    A.        It's actually called TPN liver disease, so....

7    It's not exactly well understood why it occurs, but the

8    association is known. And it can be a wide spectrum of

9    how much it affects the liver.

10   Q.        Can you estimate the frequency or duration or

11   severity of that risk?

12   A.        I don't know what the frequency of it is for

13   patients that are on TPN.  And what was the other part

14   of the question?

15   Q.        The duration or the severity of that risk.

16   A.        Again, the amount that the liver actually was

17   infected varies widely.  At the extremes, it may not

18   affect the liver at all.  At the other end of the

19   extreme, it's one of the indications for liver

20   transplant if it results in cirrhosis.

21   Q.        Has there been any recommendation of

22   intestinal transplant or liver transplant yet for Allen

23   Faron?

24   A.        No.

25   Q.        Have you discussed that with Dr. Nobuhara or

29

SUE RHEE, M.D.    March 19, 2007

1   any of the other surgeons?

2   A.        Yes.

3   Q.        And can you summarize the substance of those

4   discussions and what was said about that?

5   A.        So the main -- there's four indications for

6   evaluating or considering intestinal transplant in a

7   patient, one of which is central line infections; the

8   other is liver failure, frequent dehydration, and loss

9   of venous access.  He hasn't met any of those four

10  indications as of yet, so intestinal transplant has not

11  needed to be considered for him at this point.

12  Q.        And you continue to monitor that to determine

13  if that will become necessary in the future?

14  A.        Correct.

15  Q.        And I'm sorry.  The four indications for

16  possible transplant are line infections, hydration,

17  liver disease, and what else?

18  A.        Loss of venous access.

19  Q.        And what does "loss of venous access" mean?

20  A.        If you can't find any more veins to put a

21  central line in.

22  Q.        Is that one of the risks of chronic TPN use?

23  A.        I guess it's one of the risks of needing

24  chronic central line.

25  Q.        A risk of any chronic central line use?

30

1    up on a couple of things, have you ever expressed an

2    opinion to anyone that Allen Faron has less than five

3    years to live because he uses TPN?

4    A.        I'm sorry.  Can you just repeat that?

5    Q.        Have you ever expressed an opinion to anyone

6    that Allen Faron has less than five years to live

7    because he uses TPN?

8    A.        Not that I recall.

9    Q.        And in terms of assessing life expectancy with

10   someone who has a portion of bowel resected, is youth

11   something that's generally considered to be in favor of

12   the individual?

13            MR. KLAUDT:  Object to the form of the

14   question.

15            MS. DELANEY:  Q.  Does it help to be young?

16            MR. KLAUDT:  Same objection.

17.           MS. LENNON:  Does it help to be young in terms

18   of bowel regeneration?

19            MS. DELANEY:  Exactly.

20            MR. KLAUDT:  Same objection.

21            MS. DELANEY:  Q.  And not compromising life

22   expectancy.

23            MR. KLAUDT:  Same objection.

24            MS. LENNON:  Do you understand the question?

25            THE WITNESS:  I think so.  So -- wait.  Can

55