**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| ALLEN FARON, | No. C 07-05602 SBA |
| Plaintiff, | Related Case:<br>No. C 06-06662 |
| v. | **ORDER** |
| ST. JOSEPH HOSPITAL, *et al.*, | [Docket Nos. 48, 66] |
| Defendants. | |

Before the Court is a Motion for Summary Judgment on behalf of Defendant Ronald Cordova, M.D. (the "Motion") [Docket No. 48] and plaintiff Allen Faron's Ex Parte Application to file a Sur-Reply (the "Ex Parte Application") [Docket No. 66]. Faron has sued Cordova for medical malpractice allegedly related to health care services he received from Cordova, on August 28, 2005, in the Emergency Department at St. Joseph Hospital's in Eureka, California. Cordova seeks summary judgment under Federal Rule of Civil Procedure 56, by presenting expert testimony on the issues of standard of care and causation. Faron presents expert testimony in opposition. Cordova replies that Faron's expert is incompetent to testify regarding "emergency medical coverage" services, under section 1799.110(c) of the California Health & Safety Code. Faron seeks to file a sur-reply to address this allegedly "new" argument.

The Court having reviewed the parties' pleadings, finds this matter suitable for disposition without a hearing, under Federal Rule of Civil Procedure 78(b). As discussed below, Cordova is not entitled to invoke section 1799.110(c). As such, the Court has a battle of experts before it, and Cordova is not entitled to summary judgment. Further, if Cordova were entitled to invoke section 1799.110(c), then *his* expert would be incompetent to testify, and he would still not be entitled to summary judgment. Thus, the Court DENIES the Motion. The Court also DENIES Faron's Ex Parte Application, as Cordova did not raise any "new" arguments in his Reply.

///

///

**BACKGROUND**

At the age of 12, in Arizona, following a suspicious April 1999 chest x-ray, plaintiff Allen Faron's primary care physician at that time arranged for an upper gastrointestinal contrast series with small bowel follow through. *See* Ex. A to Mot., Decl. of Robert L. Norris, M.D. ("Norris Decl.") ¶ 5. This was performed on June 2, 1999 and revealed that Faron had an extremely rare disorder, a congenital diaphragmatic (Bochdalek) hernia. *Id.* This condition occurs in only about 1 in 2,000 to 7,000 persons, and is usually diagnosed in the newborn period. *Id.* Diagnosis in adults is extremely rare. *Id.* Faron was relatively asymptomatic at this time, *id.*; *see* Ex. B to Mot., Ponderosa Pediatrics recs. at 26, 27; Ex. C, Pl.'s 2008 Dep. 2008 Tr. at 108, and remained so through 2005.

On May 24, 2005, Faron was seen at St. Joseph Hospital's Urgent Care Center in Eureka, California, by Tuan Luu, M.D., complaining of abdominal pain in the upper-left quadrant for the past two weeks. Norris Decl. ¶ 5. This pain was associated with vomiting two to three times a day. *Id.* Luu's diagnosis was epigastric pain and Faron was discharged with instructions to follow up with his primary care physician. *See* Ex. D Mot., St. Joseph Hosp. ("SJH") recs. at 156-157.

Three months later, on August 28, 2005, Faron was seen at St. Joseph Hospital's Emergency Department by Cordova. Norris Decl. ¶ 5. He again complained of abdominal pain with vomiting. *Id.* He reported he had had similar problems three to four months earlier which resolved with Prevacid. *Id.* No history of his prior diaphragmatic problem was provided. *See* SJH recs. at 125-126; *see also* Pl.'s 2008 Dep. Tr. at 108. On examination, Faron had slight elevation of his blood pressure, but was in no distress, despite a reported pain level of "10." Norris Decl. ¶ 5. His chest exam was normal and his abdominal exam was "benign" – with only some "minimal" tenderness in the upper epigastric region. *See id.*; *see also* SJH recs. at 125-126. Cordova felt Faron's picture was consistent with "pyrosis," and he restarted Prevacid. Norris Decl. ¶ 5. At discharge, he instructed Faron to follow up with Eureka Community Health Center ("ECHC") in four to five days. *Id.*; *see also* SJH recs. at 125-126, 131-135.

Two days later, on August 30, 2005, Faron returned to St. Joseph's Urgent Care Center where he was seen by defendant Kevin Molander, M.D. Norris Decl. ¶ 5. Faron reported a recent

bout of vomiting and pain below his umbilicus. *Id.* He was tender to palpitation under the umbiculus. SJH recs. at 152. An abdominal ultrasound was performed with negative results. *Id.* Faron was continued on Prevacid and instructed to follow up with his primary care physician as soon as possible. *See id.* at 152-153, 186, 188-195.

Three days later, on September 2, 2005, Faron was seen by his primary care provider, Ellen Taylor, P.A., at the ECHC. Norris Decl. ¶ 5. Taylor noted Faron had been suffering from abdominal pain for the previous six days and the etiology was "unknown." *Id.* Blood was drawn for laboratory testing and Faron was instructed to drink lots of water and return if possible to provide a urine sample. *See* Ex. E to Mot., ECHC recs. at 5-7.

Over four months later, on January 15, 2006, Molander again saw Faron. Norris Decl. ¶ 5. Faron said he ate some Chinese food at a mall the previous day at about 3:00 p.m. and complained of nausea, vomiting, and abdominal pain. *Id.*; SJH recs. at 150. He reported having normal urinary and bowel function. *Id.* He also reported using marijuana to help him sleep. *Id.* His abdomen was non-tender to palpitation and he had decreased bowel sounds in all four quadrants. *Id.* Molander noted that Faron looked very nauseous and uncomfortable, while sitting and holding his stomach. SJH recs. at 150. His impression was gastroenteritis, possibly secondary to food poisoning versus viral gastroenteritis. Norris Decl. ¶ 5. Faron received fluids and was able to drink without nausea or vomiting. *Id.* He received Phenergan and was instructed to return to Taylor or St. Joseph as needed. *See* SJH recs. at 150-151, 198-207.

Two days later, on January 17, 2006, Faron was seen at St. Joseph's Emergency Department. *Id.* Faron reported no relief from the Phenergan, epigastric pain, since he had been to Urgent Care on January 15, 2006. *Id.* He reported vomiting and a pain of 10 out of 10. SJH recs. at 123. On exam, he had a pulse of 115, normal active bowel sounds, but trace epigastric tenderness. *Id.* He was given fluids, droperidol, and morphine by IV, and told he was apparently suffering from gastritis or dyspepsia. *Id.* at 124. He was prescribed Pepcid and instructed to follow up with the Open Door Clinic. *Id.* at 123-124, 136-137.

The next day, friends and family brought Faron, in respiratory arrest, to St. Joseph's Emergency Department at around 11:00 p.m. SJH recs. at 10. He collapsed due to respiratory

3

1 failure in Triage. *Id.* He was intubated and chemically resuscitated, but his right-sided lung sounds
2 were very poor. *Id.* at 5, 11. Defendant John Kelsey, M.D. ordered a STAT chest x-ray, which
3 showed a massive amount of bowel within the right hemithorax compressing the mediastinal left
4 hemithorax, due to an apparent right hemi-diaphragmatic bowel herniation. *Id.* Faron had
5 emergency surgery. *Id.* at 5. Surgeons entered his chest and split his diaphragm along the lateral
6 chest wall, in order to access and remove dead bowel, but a large amount of ischemic bowel was left
7 intact. *Id.* at 5-6. The wound was left open, and he went in stable but critical condition to the ICU,
8 with his cecum and ileocecal valve stapled off and left in a pouch. *Id.* at 6.

9 UCSF was contacted, as Faron would need tertiary care unavailable at St. Joseph. *Id.* Per
10 UCSF's instructions, St. Joseph surgeons operated again on Faron, within a day of his first surgery,
11 to remove more dead bowel, prior to transfer. *Id.* A total of 3.0 to 3.5 feet of bowel was removed,
12 leaving about 3.0 feet of viable bowel and 2.0 to 3.0 feet of ischemic bowel. *Id.* He was air-lifted to
13 UCSF, where he stayed for 126 days, had three more surgeries, and more bowel was removed.
14 Opp'n to Mot. at 4:13-15. He was discharged in March 2006, but readmitted to UCSF in July 2006
15 for more surgeries and rehabilitation. Docket No. 8 (Amend. Compl.) at 3:10-11.

16 Due his short bowel, Faron received at UCSF, and will always have to use, a total parenteral
17 nutrition (TPN) system, i.e., feeding tubes, 12 hours a day, though it does not and will not meet all
18 his nutrition needs. Opp'n to Mot. at 4:21-21. He also requires multiple fluid boluses for recurrent
19 dehydration. *Id.* In May 2008, he had another surgery at UCSF, and was discharged in June. *Id.*
20 at 4:24-5:7. He has experienced various complications, such as infections. *Id.* He will never again
21 eat, hydrate, or void waste as he did prior to his initial surgery. *Id.*; Docket No. 57 (Decl. of Kent L.
22 Klaudt, M.D.) ¶ 13. He has lost all of his small bowel and half of his colon. Klaudt Decl. ¶ 17. It is
23 almost certain that he will need a small bowel and liver transplant in the future, and that his
24 condition will lead to a shortened life span. *Id.*

25 **II.    Procedural Developments**

26 On July 14, 2006, Faron and his mother Nancy Faron sued ECHC, St. Joseph Hospital of
27 Eureka, St. Joseph Health System, Cordova, Molander, and Kelsey for medical malpractice in San
28 Francisco Superior Court. Mot. at 4:25-28. On July 31, 2006, the Farons amended their complaint,

///

*id.* at 5:3-4, bringing five causes of action, of which three were pled against Cordova: medical malpractice, loss of consortium, and negligent hiring and supervision. Ex. G to Mot.

On October 26, 2006, the United States Attorney's Office removed the matter to this Court, on behalf of ECHC, a federally deemed health center. *See* Docket No. 1 in No. 06-06662 SBA. (Under the Federally Supported Health Centers Assistance Act of 1995, the ECHC and its employees are covered by the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. 2671, *et seq*. Mot. at 5:6-8. The FTCA is the exclusive remedy for negligence actions brought against the employees of a federally deemed health center. *Id.* at 5:8-9.) On December 13, 2006, this matter was remanded to Humboldt County Superior Court, because ECHC was dismissed from the action and the San Francisco Superior Court had granted a motion to transfer. *See* Docket Nos. 11-13 in No. 06-06662.

On or about March 7, 2007, the parties stipulated that the cause of action for negligent hiring and supervision did not apply to the individual defendants. Ex. H to Mot. Cordova then answered. *See* Ex. I.

On or about October 22, 2007, the United States of America was substituted for Doe 26 after plaintiffs exhausted their administrative remedies with the appropriate federal agency. Mot. at 6:1-2. On November 5, 2007, the case was again removed to this Court, where on November 29, 2007, it was related to the prior removed case. Docket No. 5; Docket No. 15 in No. 06-06662.

On January 16, 2008, Faron, without his mother, filed a First Amended Complaint in this Court. Docket No. 8. It alleges medical negligence and negligent hiring and supervision against all defendants, *id.* at 8, 10, although by stipulation, the second claim does not apply to the individual defendants, Mot. at 6:9-12. On September 29, 2008, Cordova filed his Motion for Summary Judgment on behalf of Defendant Ronald Cordova, M.D. (the "Motion"). On October 14, 2008, Faron filed his Opposition to the Motion (the "Opposition") [Docket No. 56]. On October 21, 2008, Cordova filed his Reply to the Motion (the "Reply") [Docket No. 61], and on October 31, 2008, Faron filed his Ex Parte Application to file a Sur-Reply (the "Ex Parte Application") [Docket No. 66].

///

///

**LEGAL STANDARD**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment must demonstrate that there are no genuine issues of material fact. *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). An issue is "material" if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

In responding to a properly supported summary judgment motion, the non-movant cannot merely rely on the pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002); *Fed. Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).

**ANALYSIS**

**I.    The Motion for Summary Judgment on behalf of Defendant Ronald Cordova, M.D.**

The Court DENIES Cordova's Motion, because as discussed below, Cordova is not entitled to invoke section 1799.110(c) of the California Health and Safety Code, and thus the Court has a battle of experts before it, creating a genuine issue of material fact which bars summary judgment.

**A.    California law supplies the rule of decision in this matter.**

Initially, the Court notes it has jurisdiction of the tort claims pled against the United States under the FTCA. 28 U.S.C. § 2679(d)(2). In turn, the Court has supplemental jurisdiction over the

6

tort claims pled against the other defendants, all of whom provided Faron with health care services in 2005 and 2006. *See* 28 U.S.C. § 1367(a). California's substantive law controls the disposition of the latter, which were initially filed in a superior court under California law.[1] In California, the elements of a medical malpractice claim are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage. *Hanson v. Grode*, 76 Cal.App.4th 601, 606, 90 Cal.Rptr.2d 396 (1999).

### B. A battle of experts bars summary judgment for Cordova.

Under California law, a medical malpractice plaintiff, except for narrow exceptions, *must use expert witnesses to present the evidence supporting their claim to a jury*. " ' "The standard of care against which the acts of a physician are to be measured is a matter *peculiarly within the knowledge of experts*; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman." [Citations.]' " *Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 8 Cal.4th 992, 1001, 35 Cal.Rptr.2d 685, 884 P.2d 142 (1994) (emphasis added) (*quoting Landeros v. Flood*, 17 Cal.3d 399, 410, 131 Cal.Rptr. 69, 551 P.2d 389 (1976) (*quoting Sinz v. Owens*, 33 Cal.2d 749, 753, 33 Cal.2d 749, 205 P.2d 3 (1949))).

"The 'common knowledge' exception is principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.' " *Flowers*, 8 Cal.4th at 1001 (*quoting Engelking v. Carlson*, 13 Cal.2d 216, 221, 88 P.2d 695 (1939), *disapproved on other grounds in Siverson v. Weber*, 57 Cal.2d 834, 836-837, 22 Cal.Rptr. 337, 372 P.2d 97 (1962)). "The

---

[1] California law also governs the disposition of the FTCA claims, as the alleged torts occurred in California. *In re Air Crash Disaster Near Cerritos, Cal., On Aug. 31, 1986*, 982 F.2d 1271 (9th Cir. 1992) (applying in FTCA suit, sections 1431 and 1431.2 of the California Code of Civil Procedure regulating joint and several liability); *Taylor v. U.S.*, 821 F.2d 1428 (9th Cir. 1987) (applying in FTCA suit, section 3333.2 of the California Civil Code, which caps non-economic medical malpractice damages at $250,000); *Shaw v. United States*, 741 F.2d 1202, 1205 (9th Cir. 1984) (FTCA claims turn on the state law where alleged tort occurred).

classic example, of course, is the X-ray revealing a scalpel left in the patient's body following surgery." *Flowers*, 8 Cal.4th at 1001.  Rather clearly, the Court notes, the analysis related to the standard of care for defendants' diagnosis and treatment of Faron's congenital diaphragmatic (Bochdalek) hernia, and any causal relation to his subsequent treatment and physical and mental condition, is not amenable to determination by a jury under California's "common knowledge" exception.

Cordova attached to his Motion, a declaration by Robert L. Norris, M.D.  Docket No. 49, Ex. A.  He declares, inter alia, that Cordova's examination of Faron and his history taken, on August 28, 2005, met the standard of care for an emergency physician, that his diagnosis was reasonable and within the standard of care, and that his discharge instructions were appropriate. Norris Decl. ¶ 11.  He also declares that "[t]here is no evidence that any act or omission of the part of Dr. Cordova, in breach of the standard care, caused Mr. Faron's injuries."  *Id.* ¶ 12.  Cordova correctly asserts that under *Flowers*, as he has presented expert evidence negating the elements of breach and causation, Faron must come forward with expert evidence affirming these elements, in order to survive his Motion.  Mot. at 8.  The Court agrees, and notes this is not simply a substantive requirement under California law, but also a procedural requirement under Rule 56.  *See Matsushita*, 475 U.S. at 586 n.11; *Leisek*, 278 F.3d at 898.

In response, Faron attached to his Opposition, a declaration by John Cello, M.D.  Docket No. 57, Ex. A.  Cello declares, in summary, that "[t]he care and treatment of Mr. Faron at the Urgent Care clinic and Emergency Room services as described above [in his declaration] fell absolutely, totally and completely beneath the standard of care for any health care professional in this country." *Id.* (Decl. of John Cello, M.D. ("Cello Decl.")) ¶ 14.  In particular, he asserts it was sub-standard, under the circumstances, for Cordova and other providers not to perform any radiographic or laboratory studies, or a rectal exam, despite Faron's multiple visits over a short interval for nausea, vomiting, and gastric pain.  *Id.* ¶ 15.  He opines to a reasonable medical certainty that had defendants minimally met the standard of care, they would have timely diagnosed Faron's diaphragmatic hernia, leading to elective surgery and likely a normal life.  *Id.* ¶ 16.  Instead, Cello declares that due to defendants' substandard care, and failure to timely diagnosis Faron's hernia, he

8

lost virtually his entire small bowel and half his colon, suffers ongoing incapacitation and complications, will almost certainly require a bowel transplant and possibly a liver transplant, and will likely suffer a reduced life span. *Id.* ¶ 17.

The Court, therefore, has before it a battle of experts on the issues of breach and causation. Further, these issues are clearly material as their resolution affects the outcome of this action. *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146. As such, a genuine issue of material fact bars summary judgment for Cordova. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322-23.

**C.    Cordova may not invoke section 1799.110(c) of the Health and Safety Code; If he could, it would not help him.**

This does not end the Court's inquiry.  In his Reply, Cordova does not contradict the *content* of Cello's declarations. *See* Reply.  Instead, Cordova asserts that Cello is incompetent to testify, under section 1799.110(c) of the California Health and Safety Code. *See id.*  He correctly notes that Federal Rule of Evidence 601 states that "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law."  In the Ninth Circuit, this rule applies to expert witnesses. *Higgenbottom v. Noreen*, 586 F.2d 719, 720, 722 (9th Cir. 1978) (judge properly looked to state law in deciding whether or not expert witness in diversity case was competent); *see also McDowell v. Brown*, 392 F.3d 1283, 1287, 1294-95 (11th Cir. 2004) (Georgia competency law applies to medical malpractice claim removed with 42 U.S.C. § 1983 claim, because state law requires expert testimony to establish causation.); *Legg v. Chopra*, 286 F.3d 286, 289-92 (6th Cir. 2002) (Tennessee competency law applies in medical malpractice diversity case, because state law requires expert testimony to establish the standard of care.).[2]  The claims in this

---

[2]    Despite the holdings of the Sixth, Ninth, and Eleventh Circuits, there is a circuit split as to whether state law or Federal Rule of Evidence 702 governs the determination of an expert witness' competency. *See, e.g.*, *Garbincius v. Boston Edison Co.*, 621 F.2d 1171, 1173 (1st Cir. 1980); *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 475-76 (4th Cir. 2005); *Ealy v. Richardson-Merrell, Inc.*, 897 F.2d 1159, 1163 (D.C. Cir.1990).  The issue well settled, however, regarding lay witnesses. *See, e.g.*, *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 107 n.1 (4th Cir 1995) (under Federal Rules of Evidence 302, 501, and 601, state presumptions, privileges, and competency laws generally apply in diversity cases); *Kowalski v. Gagne*, 914 F.2d 299, 300, 307 (1st Cir. 1990).  Given this Court is located in the Ninth Circuit, its holdings govern this action.

matter arise under California law. Thus, the competency of the expert witnesses turns on California law.

As Cordova correctly notes, section 1799.110(c) states in part:

> In any action for damages involving a claim of negligence against a physician and surgeon providing emergency medical coverage for a general acute care hospital emergency department, the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department.

Cal. Health & Safety Code § 1799.110(c); *Petrou v. S. Coast Emergency Group*, 119 Cal.App.4th 1090, 1093, 15 Cal.Rptr.3d 64 (2004).

"Section 1799.110(c) is part of a larger Good Samaritan statutory enactment, the intent of which was to promote the provision of emergency medical care by giving dedicated emergency room physicians a measure of protection from malpractice claims." *Petrou*, 119 Cal.App.4th at 1093 (internal citations and quotation marks omitted). In order for a defendant physician to invoke this protection, however, he or she must meet two requirements.

First, this section is only triggered when a defendant physician provides emergency medical coverage "for a general acute care hospital emergency department." Health & Safety Code § 1799.110(c). The term " '[h]ospital' means an acute care hospital licensed under Chapter 2 (commencing with Section 1250) of Division 2, with a permit for basic emergency service[.]" Health & Safety Code § 1797.88. Likewise, an expert witness physician only qualifies under section 1799.110(c) if they have provided emergency medical coverage in the same type of facility. Health & Safety Code § 1799.110(c).

Second, the terms "emergency medical coverage" only extend the statute's protections to "treatment provided in the emergency department of a general acute care hospital by a physician who is 'on-duty' in the emergency department at the time" of the alleged malpractice. *Miranda v. Nat'l Emergency Servs., Inc.*, 35 Cal.App.4th 894, 900, 41 Cal.Rptr.2d 593 (1995). In other words, it protects "physicians who have been specifically employed or otherwise engaged by the hospital to

10

furnish medical treatment in the emergency room as 'emergency room physicians.' " *Id.* at 904. This section does not protect a physician who is merely "on-call" for duty in an emergency department. *Id.* at 900-04, 906. Nor does it protect a physician who treats a patient in an emergency department when they are not on duty therein. *Id.* at 900. It does, however, protect an on-duty physician, regardless of whether or not they provide emergency or non-emergency services, and regardless of whether or not they are specially trained or board certified in emergency medicine, or practice exclusively in this field. *Id.* at 904-05. These requirements apply with equal force to expert witnesses attempting to qualify under section 1799.110(c). *Id.* at 905.

In addition, for an expert witness to qualify under section 1799.110(c), they must meet the first two requirements by having five years of "substantial professional experience," based on the five years preceding the alleged medical malpractice. *Petrou*, 119 Cal.App.4th at 1093. Further, whether an expert has " 'substantial professional experience' shall be determined by the custom and practice of the manner in which emergency medical coverage is provided in general acute care hospital emergency departments *in the same or similar localities where the alleged negligence occured* [sic]." Health & Safety Code § 1799.110(c) (emphasis added); *Miranda*, 35 Cal.App.4th at 906.

> In other words . . . emergency room experience gained solely in hospitals or other facilities which do not deliver emergency care in essentially the same manner as it is delivered in the locale where the cause of action arose, [is] not enough . . . to meet the demands of subdivision (c) of section 1799.110.

*Miranda*, 35 Cal.App.4th at 906.[3]

Cordova asserts that Faron's expert, Cello, is incompetent to testify, because he lacks the qualifications required by section 1799.110(c). *See* Reply. Cordova, however, fails to first address the threshold issue of whether he is entitled to invoke this section's protections. Turning first to the facility requirement, there is no evidence before the Court as to whether the Emergency Department

---

[3] The *Miranda* court noted that in analyzing the statute, it was not determining whether it was wise policy, 35 Cal.App.4th at 901 n.10, and the Court of Appeals recently noted the unique and somewhat archaic nature of this geographical limitation, *Avivi v. Centro Medico Urgente Med. Ctr.*, 159 Cal.App.4th 463, 470-71 Cal.Rptr.3d 707 (2008).

1  at St. Joseph Hospital was legally licensed and permitted as "a general acute care hospital
2  emergency department" on August 28, 2005.  Further, there is no evidence before this Court as to
3  whether Cordova saw Faron on this date as on-duty emergency physician or by some other care
4  arrangement.  Parties in medical malpractice cases customarily stipulate to these elements of
5  section 1799.110(c).  *See, e.g.*, *Miranda*, 35 Cal.App.4th at 899.  But, here the parties have not
6  addressed these issues.  Thus, Cordova may not invoke section 1799.110(c) for purposes of this
7  Motion.  Nonetheless, as the following discussion shows, if he could invoke it, both expert witnesses
8  would be disqualified, and the Court would still DENY his Motion.

9        The Court turns first to Faron's expert, Cello.  Cordova's counsel asserts he knows him well,
10 having used him as an expert witness in cases involving gastroenterology medicine.  Reply at 2.
11 Cordova correctly notes, however, that in regards to emergency room coverage, Cello merely
12 declares, "I have experience working in Emergency Room and Urgent Care settings."  Cello Decl.
13 ¶ 4.  Cordova also filed Cello's curriculum vitae with his Reply, and he correctly notes that it fails to
14 show *any* experience by Cello in providing emergency medical coverage.  Reply at 2; *see* Docket
15 No. 63, Ex. A.  Clearly, neither the declaration nor the curriculum vitae show that from 2000
16 through 2005, Cello had substantial experience as an on-duty emergency room physician or surgeon,
17 in a general acute care hospital emergency department, delivering emergency coverage as the St.
18 Joseph Emergency Department does in Eureka.  As such, it appears that if section 1799.110(c)
19 applied to this Motion, Cello would be unqualified to provide testimony.

20       However, had Cordova successfully invoked section 1799.110(c), he would have legally and
21 metaphorically killed two birds with one stone, the second being his own expert, Norris.  In his
22 declaration, Norris states that "I am a physician duly licensed to practice medicine in the State of
23 California and I specialize in emergency medicine.  I am board certified in Emergency Medicine . . .
24 and I am a Fellow of the American College of Emergency Physicians."  Norris Decl. ¶ 1.  In his
25 curriculum vitae, attached to his declaration as Exhibit 1, Norris indicates he has been (1) since
26 1995, a medical director in Employee Health at Stanford Health Services, Norris Decl., Ex. 1 at 3;
27 (2) since 1997, chief of the Division of Emergency Medicine at Stanford University Medical Center
28 ("SUMC"), *id.*; (3) since 1998, an associate professor in the Department of Surgery in the Division

12

1 of Emergency Medicine at SUMC, *id.* at 2; (4) since 2000, an emergency medicine consultant in the
2 Stanford Sports Medicine Program, *id.* at 3; (5) since 2001, a faculty advisor to the Stanford
3 University Wilderness Medicine Student Interest Group, *id.*; (6) since 2001, a medical specialist for
4 a Menlo Park Fire Protection District urban search and rescue team, *id.*; (7) since 2002, a volunteer
5 medical consultant for the Palo Alto chapter of the Red Cross, *id.*; and (8) since 2003, adjuvant
6 faculty for Heckler and Koch, faculty for the International School of Tactical Medicine, a Santa
7 Clara County reserve sheriff deputy, and a Santa Clara County tactical medic, *id.*

8 Norris' declaration does not indicate, however, that from 2000 through 2005, he had
9 substantial experience as an on-duty emergency room physician or surgeon, in a general acute care
10 hospital emergency department, delivering emergency coverage as the St. Joseph Emergency
11 Department does in Eureka. At best, it indicates that he played an administrative role during this
12 period, in SUMC's Emergency Medicine Division. But, he has not demonstrated he was *on-duty*
13 during this period, *treating patients* in an emergency department. *Miranda*, 35 Cal.App.4th at 904.
14 As such, the Court finds that if section 1799.110(c) applied to this Motion, Norris would be
15 unqualified to testify. Without an expert witness, Cordova is unable to present any relevant
16 evidence regarding the standard of care or causation. *Flowers*, 8 Cal.4th at 1001. Thus, if Cordova
17 could invoke section 1799.110(c), the Court would DENY his Motion.

18 **II.   Faron's Ex Parte Application to file a Sur-Reply**

19 Faron requests the Court to allow him to file a sur-reply to address Cordova's argument that
20 Cello is incompetent under section 1799.110(c), on the grounds this is a "new" argument. *See* Ex
21 Parte Application. The Court DENIES the request for the obvious reason that this is not a "new"
22 argument. Cordova filed his Motion with expert testimony. Faron opposed with expert testimony.
23 Cordova replied by asserting Faron's expert was incompetent. This is a proper reply to Faron's
24 opposition. Cordova was not required to anticipate Cello's alleged incompetency in his Motion.[4]

---

26 [4] Further, under *Miranda*, Faron's proposed sur-reply adds nothing of legal significance.
Faron wishes the Court to allow Cello to declare that he has "the following experience evaluating
27 patients in the Emergency Room *and Urgent Care settings*: For the past *30 years* I have *routinely seen and evaluated patients* in emergency rooms *and urgent care settings* for the following clinical
28 complaints and/or conditions . . . ." Docket No. 67 ¶ 4 (emphasis added). While Cello declares he has "seen" patients in emergency rooms, apparently in an "on-call" posture, he fails to declare the

///

## CONCLUSION

ACCORDINGLY, the Court DENIES the Motion for Summary Judgment on behalf of Defendant Ronald Cordova, M.D. [Docket No. 48] and the Court DENIES Cordova's Ex Parte Application to file a Sur-Reply [Docket No. 66].

IT IS SO ORDERED.

November 3, 2008

_____
Saundra Brown Armstrong
United States District Judge

---

prerequisites required by section 1799.110(c) and *Miranda*, including but not limited to, substantial experience being *on-duty* from *2000 to 2005* in an emergency room.